[No. E008066. Fourth Dist., Div. Two. Mar. 26, 1991.]

MURRIETA VALLEY UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v.
COUNTY OF RIVERSIDE et al., Defendants and Respondents.

**COUNSEL**

Rutan & Tucker, Jeffrey M. Oderman and L. Ski Harrison for Plaintiff and Appellant.

Karen M. Steentofte as Amicus Curiae on behalf of Plaintiff and Appellant.

William C. Katzenstein, County Counsel, Peter H. Lyons, Assistant County Counsel, and Jay G. Vickers, Deputy County Counsel, for Defendants and Respondents.

Acret, Gropman & Turner and D. Barton Doyle as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**TIMLIN, J.—**

### FACTS

On November 28, 1989, the County of Riverside (County), by and through its board of supervisors, adopted Resolution No. 89-536 and certified Environmental Impact Report No. 217 (EIR No. 217), thus finalizing approval of Comprehensive General Plan Amendment No. 52, commonly known as the Southwest Area Community Plan or "SWAP," which covers approximately 210,000 acres or 320 square miles in the southwest section of Riverside County.

 Pursuant to Public Resources Code section 21152, County filed a notice of determination on December 7, 1989.[1] On January 5, 1990, the Murrieta Unified School District (District) mailed to County its notice of commencement of action pursuant to Public Resources Code section 21167.5, and also filed and served on County a petition for a writ of mandate.

This petition contained two causes of action:

(1) "Violation of California Environmental Quality Act," (CEQA) in which District alleged, among other things, that the County did not comply with CEQA because it had failed (a) adequately to address significant adverse impacts of the SWAP on District's ability to provide school facilities due to existing conditions of student overcrowding, (b) adequately to describe feasible mitigation measures to minimize the environmental effects of the proposed project on the provision of school facilities, (c) to consider reasonable alternatives available to avoid or lessen such detrimental impacts, (d) to adopt an adequate statement of overriding considerations to justify approval of the project in the face of the substantial unmitigated environmental impacts, and (e) to provide substantial evidence to support its adopted findings; and

(2) "General Plan Inadequacy," in which District alleged that County's general plan, as amended by the SWAP, and the SWAP itself, were in violation of Government Code sections 65300 through 65302, and specifically of section 65300.5.[2] District alleged in particular that such general plan must "comprise an integrated, internally consistent and compatible statement of policies" (§ 65300.5), and that although the Public Facilities and Services element of County's general plan provides that if land use proposals will impact schools negatively, arrangements must be made with the school districts to assist in providing adequate school facilities, and the

---

[1] Public Resources Code section 21152 provides, in relevant part, "(a) Whenever a local agency approves or determines to carry out a project which is subject to this division [division 13, Environmental Quality, Public Resources Code section 21000 et seq., commonly known as the California Environmental Quality Act (Pub. Resources Code, § 21050), or CEQA], it shall file notice of . . . whether the project will, or will not, have a significant effect on the environment and shall indicate whether an environmental impact report has been prepared pursuant to this division. The notice shall also include certification that the final environmental impact report with comments and responses, if one was prepared, is available to the general public."

A general plan amendment is a project subject to environmental assessment pursuant to the provisions of CEQA and the guidelines promulgated thereto. (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 534 [160 Cal.Rptr. 907].)

[2] Unless otherwise stated, all further statutory citations refer to the Government Code.

SWAP itself expressed a similar intent, County had failed to incorporate any terms or conditions to assure that adequate school facilities would be provided, but had instead allowed new development, both commercial and residential, to take place without regard for adequate school facilities.

District additionally alleged, as to this second cause of action, that EIR No. 217 "falsely" assumed that developer fees would mitigate the SWAP's impact on schools because County improperly determined that it had no authority to require any additional measures in mitigation and had no authority to disapprove the SWAP on the basis of inadequate school facilities.

District's petition also alleged the following facts: that (1) it is the fastest growing school district in the state of California, (2) during the 1988-1989 school year, its student enrollment increased by 124 percent, as compared with a statewide average of 4.3 percent, (3) its educational facilities are severely overcrowded and woefully inadequate for its existing student population, (4) it operates largely out of temporary, portable classrooms and on double sessions, (5) it is unable to mitigate the adverse impacts of school overcrowding through operational measures or available funding programs, (6) County's approval of the SWAP would have an extremely adverse impact on its ability to provide an adequate education for its students, (7) the maximum amount of developer fees it can impose upon new residential developments is approximately $1.56 per square foot of assessable building area, (8) it estimates the impact of new residential development on it to be approximately $3.72 per square foot of assessable building area, and (9) based on reasonable projections, it estimates that the shortfall to be generated by the SWAP between its capital facilities financing needs and developer fees is close to $1 billion.

By way of remedy, District prayed that a writ issue ordering County (1) to vacate and set aside the approval of resolution No. 89-536, which had approved the SWAP and certified EIR No. 217; (2) to refrain from doing any act in furtherance of or pursuant to the SWAP within District's boundaries, such as processing or approving zone changes, specific plans or development projects until the alleged violations and failures had been cured; and (3) to bring the general plan into compliance with the above-noted Government Code sections and to cease granting various land use permits and other entitlements within District's boundaries until such compliance was made.

County demurred to each cause of action in District's petition on the grounds that they failed to state facts sufficient to constitute a cause of

action, and District lacked standing or the capacity to sue. More specifically, County contended (1) that District had failed to exhaust its administrative remedies pursuant to section 65971 et seq. relative to the approval of the SWAP and, apparently, the certification of the EIR, (2) that District had failed to take the steps necessary to give it standing or capacity to sue, and (3) that because the State of California has preempted the field of school facilities mitigation, County could not "deny the approval of a project on the basis of the adequacy of school facilities" (§ 65996), and it also could not impose any mitigation measures other than those section 65995 developer fees as stated in EIR No. 217.

The trial court sustained County's demurrer without leave to amend, stating in its minute order:

"The state has preempted and occupied the field of school facilities, financing and mitigation, and respondent could not deny approval of a project on the basis of adequacy of school facilities."

An order dismissing the petition was filed and entered on April 6, 1990, and District promptly filed timely notice of appeal. It contends that the demurrer was improperly sustained, in that it had stated facts sufficient to constitute causes of action for mandate under CEQA and under section 65300.5 related to general plan internal consistency and compatibility requirements.

In response, County first contends that the judgment of dismissal should be affirmed because (1) District failed to verify its petition; (2) District lacks standing or capacity to sue; (3) District failed to exhaust its administrative remedies as to its challenge to the approval of the SWAP and, implicitly, the EIR certification; (4) County is unable to impose any mitigation measures other than the development fees allowed by section 65995 because the state has preempted local control over the mitigation requirements which can be imposed upon developers to alleviate a development's impact on school facilities; and (5) District failed to comply with section 65971 et seq. and, therefore, cannot allege a cause of action based on alleged internal inconsistencies within the general plan, as amended by the SWAP.

We conclude that all of County's contentions are without merit. ■ ■ ■ ■ ■ As to County's fourth and fifth contentions, we specifically conclude that mitigation measures other than the developer fees allowed by section 65995 are *not* preempted, and that District has stated a viable cause of action for mandate relief due to County's alleged violations

of CEQA and section 65300 et seq.[3] We therefore shall reverse the order of dismissal.

DISCUSSION

### 1. *District Was Not Required to Verify Its Petition*

County contends that the demurrer is sustainable on the ground that District failed to verify its petition for a writ of mandate as required by Code of Civil Procedure section 1086, which provides, "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested." In support of this contention, County relies upon the case of *Star Motor Imports, Inc.* v. *Superior Court* (1979) 88 Cal.App.3d 201 [151 Cal.Rptr. 721], in which the Court of Appeal dismissed an original proceeding because the petitioner had failed to verify its petition. Instead, the petitioner's attorney had verified the petition on information and belief.

In *Star Motor*, the court held that Code of Civil Procedure section 446, insofar as that section permits verification on information and belief, does not apply when the verification is to be used as evidence of facts. (88 Cal.App.3d at p. 204.) The court commented that the provision in Code of Civil Procedure section 446 which allows verification on information and belief "palpably refers to pleadings that join issues, such as the common complaint and answer of a lawsuit [citations]," and that "[w]here the verification, or affidavit, is to be 'used as evidence' of facts, 'Section 446 [Code Civ. Proc.] does not apply.' [Citation.]" (*Id.* at p. 204, italics omitted.) It then pointed out that a petition for a writ of mandate ordinarily states facts, and that because of the required verified factual showing, " 'the burden is cast upon the respondent to proceed and show to the satisfaction of the court why he has not performed the act demanded . . . .' " (*Id.* at p. 205, quoting *Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 797 [136 P.2d 304].)

The issue here, however, is not the efficacy of a verification on information and belief of a petition for a writ of mandate. The question is whether or not public entities which are exempt from pleading verification requirements, as set out in Code of Civil Procedure section 446, are also

---

[3] A demurrer admits all material facts which are properly pleaded in the petition but not contentions and deductions, nor conclusions of fact or law. (*Black* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Because this appeal is from a dismissal following the sustaining of a demurrer without leave to amend, we assume, on review, that District can prove all of the facts it has alleged. (*Fundin* v. *Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955 [199 Cal.Rptr. 789].)

exempt from the verification requirement of Code of Civil Procedure section 1086.

We have found only one other case in which this specific issue was raised. In *Fall River Joint Unified School Dist.* v. *Superior Court* (1988) 206 Cal.App.3d 431 [253 Cal.Rptr. 587], the petitioner, a school district, argued that it need not verify its petition because of the exemption from verification granted to government entities, including school districts, by Code of Civil Procedure section 446. The *Fall River* court noted that "While we can find no case in which section 446 has actually been applied to a public agency's petition for an extraordinary writ, at least one treatise seems to presume that it is applicable. (See Cal. Civil Writ Practice (Cont.Ed.Bar 1987) § 7.41, p. 291.)" (*Id.* at p. 436.) The court was able to sidestep this issue, however, because it did not need to rely on any factual allegations in the petition to determine the merits of the case. It needed only to depend on the exhibits to the petition to determine an issue of pure law. (*Ibid.*)

Although, as noted earlier, the court assumes all factual allegations to be true when reviewing a ruling on a demurrer, and, therefore, need not rely on the factual allegations to establish the truth of any alleged fact, we decide the verification issue because it is a repetitious question of statewide concern.

In general, complaints need not be verified. Verification is necessary only when called for by a particular statute. (E.g., in civil actions: complaints seeking a preliminary injunction (Code Civ. Proc., § 527, subd. (a)), quiet title actions (Code Civ. Proc., § 761.020), and actions under the Revised Uniform Reciprocal Enforcement of Support Act of 1968 (Code Civ. Proc., § 1673); in special proceedings: unlawful detainer (Code Civ. Proc., § 1166), petitions for extraordinary relief (Code Civ. Proc., §§ 1069, 1086, 1103), and probate petitions (Prob. Code, § 1021).) None of these statutes which require verification specifically exempt public entities from the verification requirement; instead, Code of Civil Procedure section 446 definitely provides that when a public entity is the plaintiff, "the complaint need not be verified."

Although section 446 is found in part 2, "Of Civil Actions," of the Code of Civil Procedure, and petitions for a writ of mandate are not civil actions, but "Special Proceedings of a Civil Nature" (part 3 of the Code of Civil Procedure), 18A West's Annotated Code of Civil Procedure (1980 ed.) section 1109, page 762 provides, "Except as otherwise provided in this Title [title 1, 'Of Writs of Review, Mandate and Prohibition'], the provisions of

Part 2 of this Code[4] are applicable to and constitute the rules of practice in the proceedings mentioned in this Title." Thus, the provisions of Code of Civil Procedure section 446, including the provision exempting public entities from the need to verify either complaints or answers, apply to writ proceedings "[e]xcept as otherwise provided" by statutes related specifically to writ practice. Although Code of Civil Procedure section 1086 states that the petition should be verified, it does not purport to "provide otherwise" than Code of Civil Procedure section 446; i.e., it does not specifically require public entities to verify petitions for a writ of mandate. (Cf. *Wings West Airlines* v. *Workers' Comp. Appeals Bd.* (1986) 187 Cal.App.3d 1047, 1055 [232 Cal.Rptr. 343], holding that the Director of the Department of Industrial Relations, in connection with a petition for review of an order of the Workers' Compensation Appeals Board, was not required to verify a petition for reconsideration, despite a statutory requirement that such petition be verified (Lab. Code, § 5902), because the public entity exception of Code of Civil Procedure section 446 was applicable to proceedings before the Industrial Accident Commission, the predecessor of the Workers' Compensation Appeals Board. See also *Lertora* v. *Riley* (1936) 6 Cal.2d 171, 176 [57 P.2d 140]; *Seckels* v. *Department of Industrial Relations* (1929) 98 Cal.App. 647, 648 [277 P. 497].)

We therefore conclude that District, a public entity, is exempt from the verification requirement of Code of Civil Procedure section 1086 and was not required to verify its petition.

### 2. *District Has Both the Standing and the Capacity to Sue*

County asserted in connection with its demurrer that District's failure to allege compliance, and its failure to comply, with section 65971 had deprived District of the standing or capacity to sue. On appeal, County's argument, which it acknowledges "does not fit neatly into a well defined legal box," seems to be that District has failed to exhaust its administrative remedies because it did not allege that it (1) had made certain findings concerning overcrowding conditions in its attendance areas and (2) had then notified County's board of supervisors by a "statement of impaction" *before* County approved the SWAP and certified the EIR, and, consequently, it lacks the capacity to sue.

In response, District contends that it clearly has alleged a beneficial interest in the outcome of this action so as to have shown standing to sue, that the standing issue is separate from the issue of exhaustion of adminis-

---

[4] A footnote at this point in 18A West's Annotated Code of Civil Procedure, *supra*, section 1109, states: "Section 307 et seq."

trative remedies, and that there is no statute or case law which requires it to exhaust its purported "administrative remedies" under section 65970 et seq. as a prerequisite to its right to assert County's alleged violation of CEQA and to challenge the adequacy and consistency statutes regarding its general plan.

In our opinion, County errs by intertwining the issues of standing, capacity to sue, and exhaustion of administrative remedies.[5] (See *California Aviation Council* v. *County of Amador* (1988) 200 Cal.App.3d 337, 349 [246 Cal.Rptr. 110], Blease, J., conc.: "This requirement [standing] is sometimes confused with the entirely separate issue of exhaustion of administrative remedies. [Citation.]")

■ District clearly has capacity to sue pursuant to Education Code section 35162.[6] It also clearly has standing to sue, having alleged sufficient facts to show that it is beneficially interested, within the meaning of Code of Civil Procedure section 1086,[7] in the issuance of a writ of mandate. (*Braude* v. *City of Los Angeles* (1990) 226 Cal.App.3d 83, 87-89 [276 Cal.Rptr. 256]; see *Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 831-833 [173 Cal.Rptr. 602], holding that the water district, as the agency responsible for providing water to a proposed project, had a special interest in insuring that the EIR fully and adequately dealt with the issue of delivery of water to the project.) Surely, District has a special interest in making sure that the EIR complies with the requirements of CEQA and the statutory adequacy and consistency requirements of the Government Code related to general plans, so as to assure it that the impact of the approval of the SWAP on the conditions of overcrowding and inadequate school facilities were considered, that feasible mitigation measures were provided in the SWAP, or that reasonable available alternatives were employed to avoid or lessen the impact.

Thus, the only real issue is whether or not District failed to exhaust administrative remedies by not complying with section 65970 et seq. We conclude that section 65970 et seq. does not provide administrative reme-

---

[5] The County stated in its respondent's brief that: "A Petitioner who does not exhaust its administrative remedies does not have standing to sue" and cited four cases to support such. None of the cases so hold.

[6] "In the name by which the district is designated the governing board may sue and be sued, and hold and convey property for the use and benefit of the school district."

[7] "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested."

dies that require exhaustion before the trial court has jurisdiction over the two causes of action alleged in the petition.

### 3. District's "Failure" to Pursue Its Options Under Section 65970 et seq. Was Not a Failure to Exhaust Its Administrative Remedies Related to County's Certification of EIR No. 217 and Approval of the SWAP

a. *Certification of EIR*

Public Resources Code section 21177 provides, in relevant part, that:

"(a) No action may be brought pursuant to [Public Resource Code] Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person.

"(b) No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing."

Public Resources Code section 21177 codifies the exhaustion of administrative remedies doctrine. (Historical Note, 56A West's Ann. Pub. Resources Code (1986 ed.) § 21177, p. 279; *California Aviation Council* v. *County of Amador, supra,* 200 Cal.App.3d 337, 342-343.) By its own terms, this provision merely requires that before bringing an action under CEQA, a party first must have made known to the responsible public agency the basis for its objections to a project.

■ County does not contend that District failed to make its objections known to County during the relevant proceedings. Instead, it contends that District was required to bring its concerns about existing school overcrowding to County's attention pursuant to specific sections of the code, i.e., section 65970 et seq.

Section 65971 provides:

"(a) The governing body of a school district which operates an elementary or high school shall notify the city council or board of supervisors of the city or county within which the school district is located if the governing body makes both of the following findings supported by clear and convincing evidence:

"(1) That conditions of overcrowding[8] exist in one or more attendance areas within the district which will impair the normal functioning of educational programs including the reason for the existence of those conditions.

"(2) That all reasonable methods of mitigating conditions of overcrowding[9] have been evaluated and no feasible method for reducing those conditions exist.

"(b) The notice of findings sent to the city or county pursuant to subdivision (a) shall specify the mitigation measures considered by the school district. . . .

". . . . . . . . . . . . . . . . . . .

"If the city council or board of supervisors concurs in those findings, Section 65972 shall be applicable to actions taken on residential development[10] by the city council or board of supervisors."

Specifically, if the city council or board of supervisors concurs in such findings, it "shall not approve an ordinance rezoning property to a residential use, grant a discretionary permit for residential use, or approve a tentative subdivision map for residential purposes, within such area [attendance area where overcrowding conditions are determined to exist pursuant to section 65971], unless [it] makes one of the following findings:

"(1) That an ordinance pursuant to Section 65974 has been adopted,[11] or

"(2) That there are specific overriding fiscal, economic, social, or environmental factors which in the judgment of the city council or board of

---

[8] "Conditions of overcrowding" is defined by section 65973, subdivision (a) as meaning "that the total enrollment of a school, including enrollment from proposed development, exceeds the capacity of the school as determined by the governing body of the district."

[9] "Reasonable methods for mitigating conditions of overcrowding" are defined by section 65973, subdivision (b) as including, "but . . . not limited to, agreements between a subdivider or builder and the affected school district whereby temporary-use buildings will be leased to the school district or temporary-use buildings owned by the school district will be used and agreements between the affected school district and other school districts whereby the affected school district agrees to lease or purchase surplus or underutilized school facilities from other school districts."

[10] "Residential development" is defined by section 65973, subdivision (c) as meaning "a project containing residential dwellings, including mobilehomes, of one or more units or a subdivision of land for the purpose of constructing one or more residential dwelling units."

[11] Such an ordinance may require the dedication of land, the payment of fees in lieu thereof, or a combination of both, for five years worth of interim temporary classrooms and related facilities as a condition to the approval of a residential development. (§ 65974, subd. (a).)

"Approval of a residential development" means "any approval for the development prior to and including the issuance of a building permit for the development." (§ 65980, subd. (a).)

supervisors would benefit the city or county, thereby justifying the approval of a residential development otherwise subject to Section 65974." (§ 65972.)

County cites no authority for its proposition that this elaborate statutory scheme, by which school districts may bring overcrowding to the attention of cities and counties and in some cases thereby obtain financial help by fees or land dedication to establish *interim* and temporary school facilities, constitutes an administrative remedy which must be exhausted as a prerequisite to any action brought pursuant to CEQA.

In a concurring opinion in *California Aviation Council* v. *County of Amador, supra,* 200 Cal.App.3d 337, Justice Blease discussed the doctrine of exhaustion of administrative remedies, as it applied to a petition for writ of mandate to set aside a negative declaration. He made the following observation which is particularly relevant to County's claim that District was required to comply with the above-noted sections and allege such compliance before it could bring this action under CEQA.

"Ordinarily we use the word remedy as meaning a device to redress a wrong. It is decidedly inappropriate to speak of remedying a wrong which has not occurred and may not occur. Prior to the adoption of a negative declaration under the scheme here in issue there is no wrong to be remediated. Hence, the mere public opportunity to participate in an administrative proceeding prior to the adoption of a negative declaration is not a remedy. The exhaustion of administrative remedies doctrine has never applied where there is no available administrative remedy. (See e.g., *Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 690-691 [94 Cal.Rptr. 421, 484 P.2d 93]; *Southern Pacific Transportation Co.* v. *State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 945, fn. 3 [237 Cal.Rptr. 191]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 238.)

"This semantic point mirrors practical considerations. Most of the time we may reasonably expect administrative agencies to obey the law. Indeed, courts are directed to assume that such is the case. Prior to an unlawful administrative act, the incentive of a member of the public to participate in the administrative proceeding to assure that the law will be followed is slight. It is an artificial constraint to bar judicial remediation of such unlawful acts to members of the public who have neither the time nor resources to attend all of the government functions at which wrongful action theoretically might be taken. It is unfair and unwise to penalize the public for proceeding on the expectation that the law will be obeyed." (200 Cal.App.3d at pp. 348-349.)

So too here, before County adopted EIR No. 217, with its allegedly inadequate mitigation measures related to the impact on the area's school facilities, there was no wrong to be remedied. The mere fact that section 65970 et seq. provides school districts with a means by which they can bring existing overcrowding of school facilities to the attention of those agencies responsible for making land-use decisions so that arrangements for financing *interim* and temporary facilities can be made has nothing to do with whether or not adequate land use and development mitigation measures related to interim and permanent school facilities have been included in an EIR prepared in connection with the adoption of an amendment to a general plan. It is obvious that the statutory scheme set out in section 65970 et seq. was never intended to be an administrative remedy by which school districts could address defective EIR's by a mandamus action under Code of Civil Procedure section 1094.5.

b. *Approval of the SWAP*

■ The same principles and reasoning apply to the second cause of action contesting the adequacy of, and asserting internal inconsistency in, the general plan as amended by the SWAP in violation of section 65300.5. Moreover, we have not discovered, and County has not provided any citation to state legislation, judicial decisions or any provision in any of its own legislative enactments, including ordinances, resolutions or even its general plan, that requires a beneficially interested school district to engage in the 1977 School Facilities Act (§ 65970 et seq.) process for obtaining monies or land to finance interim school facilities before it may file a mandamus action under Code of Civil Procedure section 1085 et seq. to set aside a general plan amendment based on allegations of inconsistencies in the general plan as so amended.

We note that County appears to argue in support of its theory of a prior administrative remedy being available to District that without District's "school impaction statement" under section 65971, County and this court are hampered *in reviewing the evidence* supporting District's allegation that a condition of overcrowding exists. A review of the evidence is a matter for trial. It does not relate to whether District is jurisdictionally precluded from alleging the second cause of action because it did not pursue an available administrative remedy.

We conclude that District was not required to allege that it took certain action under section 65971 before it could file a mandamus action alleging the inadequacy of, and inconsistency in, the general plan as amended, based on the plan's conflicting policies of (1) allowing unrestricted future land

uses without consideration of the impact of such on public school facilities, and (2) providing for coordination between County and school districts as to land use and development so as to mitigate such impact via such methods as special use standards.

### 4. County's Authority to Specify Land Use and Development Mitigation Measures in Connection With an Amendment of Its General Plan Is Not Preempted by Sections 65995 and 65996

County contends, and District concedes, that the state has preempted the field of school facilities financing, and that County has no authority to impose school facilities financing fees in excess of the amounts which District itself may impose under section 65995, subdivision (b) in order to mitigate the detrimental environmental effect the SWAP will have on District's school facilities.

However, County further contends that the state also has preempted the field of mitigation measures which may be imposed to ameliorate such adverse effects of development on school facilities. This contention is based on the language of section 65996.[12] County appears to urge that the adoption of an amendment to its general plan is a "development project" and "project" within the meaning of those terms as used in section 65996, and that because of the constraints of sections 65995 and 65996, it can impose only the collection of section 65995 fees as a measure mitigating the impact of future development on the school facilities within the area covered by the SWAP, and that because of the mandates of section 65996, it

---

[12] Section 65996 provides: "The following provisions shall be the exclusive methods of mitigating environmental effects related to the adequacy of school facilities when considering the approval or the establishment of conditions for the approval of a development project, as defined in Section 53080, pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code:

"(a) Chapter 22 (commencing with Section 17700) of Part 10 of the Education Code.

"(b) Chapter 25 (commencing with Section 17785) of Part 10 of the Education Code.

"(c) Chapter 28 (commencing with Section 17870) of Part 10 of the Education Code.

"(d) Article 2.5 (commencing with Section 39327) of Chapter 3 of Part 23 of the Education Code.

"(e) Section 53080 of the Government Code.

"(f) Chapter 2.5 (commencing with Section 53311) of Division 2 of Title 5 of the Government Code.

"(g) Chapter 4.7 (commencing with Section 65970) of Division 1 of Title 7 of the Government Code.

"No public agency shall, pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code or Division 2 (commencing with Section 66410) of this code, deny approval of a project on the basis of the adequacy of school facilities."

may not rely on such unmitigated impact on school facilities as a basis upon which to deny approval of the SWAP.[13]

County makes this contention despite the existence of a holding to the contrary in *Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201 [252 Cal.Rptr. 825]. County characterizes it as "unfortunate and regrettable" that the portion of *Mira* relevant to this issue was published, and attempts both to characterize the holding as mere dicta and to fault that court's analysis. County then engages in some legislative analysis designed to demonstrate that the Legislature has since acted to abrogate the holding in *Mira*. These efforts are to no avail.

In *Mira*, the Mira Development Corporation needed to have a piece of real property rezoned from single family to multifamily use in order to build an apartment project. The San Diego City Council denied Mira's rezoning application, even though the proposed density would have been consistent with the general plan, because of the inadequacy of the schools, streets, public improvements and similar infrastructure elements.

Mira petitioned the superior court for a writ of mandate to compel the city council to reconsider its denial of Mira's rezoning application, contending that the city council had abused its discretion. The superior court denied the petition and Mira appealed, contending, among other things, that section 65996 prohibited the council from relying on school overcrowding as a basis for denying the rezoning application. (205 Cal.App.3d at p. 1217.)

The Court of Appeal affirmed the trial court decision and held that the council did not abuse its discretion when it denied the application on the ground that the proposed development would "outstrip the provision of needed public services and improvements in the area, a concern included within the community and general plans." (205 Cal.App.3d at pp. 1204-1205.) More specifically, as to Mira's reliance on section 65996, the court concluded that a rezoning is not a "development project," as that term is used in section 65996 (*id.* at pp. 1217-1218), and that section 65996 was never intended to interfere with local governments' *legislative* acts in connection with control over zoning and land-use *policy*, as opposed to local governments' administrative acts related to other land use decisions such as subdivision approvals, variances and conditional use permits. (*Ibid.*)

Here, we are dealing with a general plan amendment which is a statement of broad goals, policies, future land use and developmental plan proposals,

---

[13] County does not actually admit that the developer fees will not totally mitigate such impact, but it is implicit in County's arguments that even if such impact is not mitigated, County's hands are tied by the proscription of section 65996.

standards, principles and objectives for a relatively large undefined area of land—approximately 320 square miles; not a rezoning of a specific parcel of land. ▮ As stated by this court in *City of Santa Ana* v. *City of Garden Grove, supra,* 100 Cal.App.3d 521, 532, a general plan is a "basic land use charter governing the direction of future land use in the local jurisdiction . . . . [G]eneral plans now embody fundamental land use decisions that guide the future growth and development of cities and counties . . . ." ▮ If a zone change is a legislative act, there is no doubt that a general plan amendment is a legislative act. (§ 65301.5; *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 728-729 [135 Cal.Rptr. 588].) Therefore, under the holding of *Mira,* the SWAP is not a "development project" and, as a result, not subject to the exclusive mitigation measures stated in section 65996.

It is recognized that the prohibition provision in section 65996 respecting no public agency denying approval on the basis of adequacy of school facilities uses the word "project," not "development project." *Mira* noted that section 65931 defines "project" as " 'any activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.' " (205 Cal.App.3d at p. 1217.) This definition obviously refers to a public agency performing either a quasi-adjudicative, ministerial or discretionary administrative act; not a legislative act of establishing a policy or rule for future activity. In our view, "project" as used in section 65996 does not encompass general plan amendments such as the SWAP at issue here.[14]

As noted above, County contends that the Legislature has since abrogated *Mira*'s holding by adopting chapter 1209, Statutes 1989, effective October 1, 1989. However, the Second District Court of Appeal, in *William S. Hart Union High School Dist.* v. *Regional Planning Com.* (1991) 226

---

[14] At oral argument, counsel for County argued that "project," as used in the final paragraph of section 65996, means "project" as defined in Public Resources Code section 21065. He stated that the Legislature could not have done anything more to make clear that it intended that the Public Resources Code definition of "project" should apply to section 65996.

Given that the section 65931 definition of "project" is, by its terms, expressly made applicable "[u]nless the context otherwise requires" (§ 65925) to chapter 4.5 of divison 1, title 7 of the Government Code relating to review and approval of development projects, and given that the context of section 65996 does not require resort to any definition other than that set out in section 65931, it is apparent that if the Legislature *had* intended the Public Resources Code definition of "project" to apply to section 65996, it could have worded the final paragraph of section 65996 as follows:

"No public agency shall, pursuant to Division B (commencing with Section 21000) of the Public Resources Code or Division 2 (commencing with Section 66410) of this code deny approval of a project, *as that term is defined in Public Resources Code section 21065,* on the basis of the adequacy of school facilities."

Cal.App.3d 1612 [277 Cal.Rptr. 645], specifically agreed with the analysis in *Mira*, and concluded that subsequent legislative action indicated no intent on the part of the Legislature to abrogate either the holding in *Mira* or in *Landi* v. *County of Monterey* (1983) 139 Cal.App.3d 934 [189 Cal.Rptr. 55], an opinion on which the *Mira* court had relied for the proposition that a rezoning is not a development project. As discussed earlier, we also agree with *Mira*'s reasoning and further agree with *Hart*'s analysis of the preemption issue.

The facts of *William S. Hart Union High School Dist.* are as follow. The County of Los Angeles approved two developers' applications for approval of a conditional use permit, zone changes, a local plan amendment, a development agreement and a tentative subdivision tract map for certain real property. The approval came despite the fact that (1) the planning commission and planning director's reports acknowledged that school classroom supply was not adequate and that the proposed development potentially would have a significant impact on the school districts, and (2) before the development applications were approved, the districts had appeared in the administrative proceedings and protested. They argued that approval would violate the development monitoring system [a set of specific mandatory guidelines which must be followed before approval of development projects in urban expansion areas] and would be inconsistent with the County's general plan because adequate infrastructure was not available to serve the development and because mitigation measures, as required by the development monitoring system, had not been imposed. These protests were ignored, the County taking the position that it could not require adequate mitigation measures because sections 65995 and 65996 preempted any such action and prohibited it from following the procedures set forth in the development monitoring system.

The school districts petitioned the superior court for a writ of mandate and for injunctive and declaratory relief, seeking to compel the board to set aside its approval of the development project and to take no further action until the board complied with the requirements of the development monitoring system and found that the project was consistent with the general plan. The County demurred, contending, as does County here, that section 65995 preempted the application of various mitigation measures proposed by the districts. Its demurrer was sustained without leave to amend.

The districts moved for reconsideration, contending that *Mira* gave the County the right to impose mitigation measures other than the developer fees allowed by section 65995, and that the County's decision to approve the project had been based on erroneous legal advice from county counsel. The

motion for reconsideration was denied, the action was ordered dismissed, and the districts appealed.

The appellate court reversed the judgment of dismissal, concluding that the school districts should be given an opportunity to amend their petition so as to state a cause of action. The reversal was premised on the court's conclusion that *Mira* was still good law, despite the County's argument that subsequent legislative action had been intended to abrogate the holding in *Mira*:

"We agree with the analysis in *Mira*. The court's reasoning is bolstered by the fact that the Legislature is presumed to have knowledge of California's judicial decisions and to enact and amend statutes with those decisions in mind. [Citation.] Here, . . . although the Legislature knew of the *Landi* decision and that court's interpretation (vis-à-vis zoning ordinances) of section 65928's definition of 'development project,' it still used that same definition (sans one sentence) when it amended section 53080, enacted section 65996, and changed the definitional reference to 'development project' in sections 65995 and 65996 so as to refer to section 53080 rather than section 65928. In other words, the Legislature has not seen a need to enact legislation to counter the decision in *Landi* (or *Mira*)." (226 Cal.App.3d at p. 1624; see also fn. 11 at p. 1623.)[15]

The court in *William S. Hart Union High School Dist.* concluded that if the County of Los Angeles, "based upon erroneous legal advice, believed that it had no choice but to grant [the requested] zoning changes, and therefore did not sufficiently consider the impact on school facilities that the proposed zoning changes would have, or what mitigation measures, if any, might be required, then it has not discharged its responsibilities under the

---

[15] Another fact indicating legislative approval of *Mira*, not mentioned by the court in *William S. Hart Union School Dist.*, but raised by amici curiae Schools Legal Defense Association, is that on December 4, 1990, Assembly Member O'Connell, a member of the six-member committee that wrote the provisions of what became chapter 1209, Statutes of 1989 (which chapter County contends was intended to repeal *Mira*) introduced Assembly Bill No. 80. Assembly Bill No. 80 proposes to amend section 65996 of the Government Code by adding, among other things, the following underlined language:

"65996. The following provisions shall be the exclusive methods of mitigating environmental effects related to the adequacy of school facilities when considering the approval or establishment of conditions for the approval of a development project, as defined by section 53080, *by administrative or legislative action* pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code: . . ."

As amici curiae point out, such a proposed amendment, which presumably is designed to tie the exclusive methods of mitigation to both administrative *and* legislative action in approving or establishing conditions for approval of development projects, would not be necessary if the holding in *Mira* had in fact been abrogated by earlier legislation which O'Connell himself helped draft.

[development monitoring system contained in County's general plan] and the general plan" (*id.* at p. 1627), and that therefore the school districts should be allowed to amend their petition to allege that the rezoning decision had been based on erroneous legal advice from county counsel, and that the board had relied on and applied that misinformation in making its decision. (*Id.* at pp. 1627-1628.)

Neither sections 65995, subdivision (e)[16] nor 65996, as amended, preempt County's authority or prohibit it from considering and providing feasible land use and development mitigating measures in an EIR and in the general plan amendment to which it relates, which plan amendment allegedly contributes to student overcrowding and adversely affects the existing condition of inadequate school facilities in a school district. As mentioned by District, those measures could include reduction of residential densities or imposing a controlled phasing of single and multiple family residential development within those attendance areas of District which have inadequate school facilities.

### 5. *District Has Stated a Valid Cause of Action for Violation of CEQA*

 Here, unlike the situation in *William S. Hart Union High School Dist.*, District alleged a cause of action not only for violation of statutes related to general plan amendments, but also for violation of CEQA. This latter cause of action alleges that County violated CEQA by, among other things, approving an EIR, which failed to adopt adequate mitigating measures related to the environmental impact of future development on school facilities, contained findings not supported by adequate evidence, and failed, in the alternative, to adopt a statement of overriding considerations to justify approval of the project in the face of the substantial unmitigated environmental impacts. Because, under *Mira*, County was not prevented from adopting mitigation measures other than the financing measure set out in section 65995, District's allegations that there is no substantial evidence to support County's finding that the impact on school facilities will be considerably mitigated by this one measure,[17] and that County did not make

---

[16] As alluded to in *Hart*, subdivision (e) of section 65995 is limited to prohibiting public agencies from imposing fees as a condition to approval of a development project in order to reduce the project's negative impact on overcrowded schools. It states that *financing* of school facilities with development fees is preempted by the state law. This is a far cry from stating that a public agency cannot include in a general plan amendment land use and development objectives and standards to mitigate the amendment's potential negative effects on adequacy of school facilities.

[17] County does not argue, on appeal, that there was substantial evidence to support the finding that the impact on school facilities was substantially mitigated, instead concentrating

an alternative statement of overriding considerations to justify approval of the project in the face of the unmitigated impact on school facilities, are sufficient to state a valid cause of action under CEQA.

### 6. District Has Stated a Valid Cause of Action for Violation of Statutes Related to General Plans and Amendments Thereto

Section 65300.5 requires that the elements of a general plan comprise an integrated, internally consistent and compatible statement of policies. (§ 65300.5; *Sierra Club* v. *Board of Supervisors* (1981) 126 Cal.App.3d 698, 704 [179 Cal.Rptr. 261].) The adoption of an amendment to a general plan is a legislative act which is reviewable by way of a petition for a writ of mandate (§ 65301.5; Code Civ. Proc., § 1085). ▮▮▮ When elements of a general plan are found to be insufficiently correlated and inconsistent upon review, the appropriate remedy is to issue a writ of mandate requiring a county's board of supervisors to set aside the inconsistent elements so that they can be amended to achieve the statutorily required correlation and consistency. (*Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 103-104 [212 Cal.Rptr. 273]; § 65358.)

In its second cause of action, District alleged that the adoption of the SWAP created internal inconsistencies in County's general plan. Specifically, District alleged that

"(a) The Public Facilities and Services Element of [County's] General Plan provides in pertinent part that 'when school districts adopt impaction statements, the County will coordinate with the districts to develop appropriate financing mechanisms for school facilities.' The Public Facilities and Services Element further provides that if land use proposals will impact schools 'they must arrange with the school districts to assist in providing adequate school facilities.' Contrary to these mandates, the SWAP provides for development within the Murrieta Valley Unified School District boundaries without appropriate financing mechanisms for required school facilities being in place and without any arrangements having been made with the District for the provision of adequate school facilities.

"(b) A number of provisions in the SWAP itself clearly state the goal and intent that development be accompanied by adequate school facilities. For example, Section II of the SWAP sets forth the goals of the Community Plan to include:

---

on its argument that it was not free to impose any mitigation measures other than the section 65995 developer fees. Thus, for purposes of this appeal, it has conceded that there was no substantial evidence.

. . . . . . . . . . . . . . . . . . . .

'2. The attainment of an orderly and efficient pattern of growth through the encouragement of development where public services can be provided and where surrounding land uses are compatible.

'3. The development of adequate and attractive schools, parks, libraries and other public facilities. . . .

'9. Cooperation between the County of Riverside, school districts, service districts and agencies to ensure that necessary and desirable public facilities and services are available. . . .'

"Section IV of the SWAP goes on to state the intent of specific Growth Management Policies to include 'that public services and facilities keep pace with growth.' Notwithstanding these and other clear statements of intent, the SWAP totally fails to incorporate any terms or conditions to assure that adequate school facilities will be provided. Indeed, resolution No. 89-536 and EIR No. 217 falsely assume that developer fees will mitigate the school impacts and [County] improperly determined that they have no authority to require additional mitigation."

 On appeal, County's only contention is that because District failed to comply with section 65970 et seq. (which requirements we have discussed in detail above in connection with County's exhaustion of administrative remedies argument), it cannot state a cause of action based on the inadequacy and internal inconsistency of the general plan. More precisely, County points to the language of section IV.E. programs 2 of its general plan, which provides:

"When a school district *officially adopts a statement of impaction*, the County will coordinate with the district to develop appropriate mitigation measures, such as the development of more equitable methods of distributing financing costs, or the development of additional land use standards requiring specific mitigation of school impacts from proposed development." (Italics added).

It then argues that "[s]ince [District] was unable or unwilling to adopt a finding [pursuant to Government Code section 65971] that a 'condition of overcrowding exist[s,]' [County] was unable to implement the General Plan policies which [District] now claims are inadequate or inconsistent."

Setting aside the recognition that this statement refers to facts not alleged in the petition and is, therefore, not properly considered by this court in reviewing a trial court's sustaining of a demurrer, this argument is based on several implicit premises, none of which County attempts to support.

First, County assumes that the statement of impaction which must be officially adopted by school districts as a prerequisite to any cooperation by County is the finding, pursuant to section 65971, that a condition of overcrowding exists. Nowhere in section 65970 et seq. is there any reference to a "statement of impaction." Nowhere in the general plan is there any notice that the statement of impaction referred to in section IV of the general plan must consist of the specific findings set forth in section 65971. We see no reason to allow County now to assert that only a statement which meets the specific requirements of a statutory scheme designed to provide *interim* and temporary school facilities is a sufficient "statement of impact" to put County on notice that it needs to coordinate appropriate mitigation measures with school districts. This view is particularly reaffirmed by the general plan policy that the County will coordinate with the District as to development of "additional land use standards requiring specific mitigation of school impacts from proposed development." This requirement has no relationship to financing interim school facilities as a mitigation effort. It refers to mitigation by land use and development standards.

Second, County assumes that its duty to coordinate mitigation measures with school districts is the same as its duty not to adopt an amendment to its general plan which is inconsistent with the general plan. These are two separate issues. The duty to coordinate mitigation measures is imposed by the terms of the general plan itself. The duty not to adopt inconsistent elements is imposed by section 65300.5.[18]

Third, County, having confused the nature and identity of these separate duties, has also confused the nature and identity of the remedies for the breach of these duties. The allegations of District's second cause of action are not that County has failed to *coordinate* mitigation measures with District, but that the general plan, as amended by the SWAP, is not an integrated, internally consistent and compatible statement of policies as required by section 65300.5. Even assuming that District has not officially adopted a statement of impaction, there is no reason that it cannot bring an action under section 65300.5, as it has done, to allege that the SWAP is

---

[18] In addition, County ignores the fact that, separate and apart from any duty under the terms of the general plan to *coordinate* mitigation measures with school districts, it has a duty under CEQA to provide adequate mitigation measures for environmental impacts on school facilities which will be caused by proposed development.

inconsistent with certain provisions of the general plan because the general plan requires an adequate infrastructure and the SWAP does not contain any terms or conditions to assure that public services and facilities, including schools, will keep pace with the growth allowed under the SWAP.

We conclude the trial court abused its discretion in sustaining County's demurrer to the first and second causes of action of the petition without leave to amend.

### DISPOSITION

The order of dismissal is reversed and the cause is remanded to the trial court which is directed to overrule County's demurrer to the first and second causes of action of the petition, and to give County a reasonable period of time to further respond to each of those causes of action.

District shall recover its costs on appeal.

Dabney, Acting P. J., and Hollenhorst, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 30, 1991.