[No. B118164. Second Dist., Div. Four. Mar. 12, 1998.]

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PAUL C. et al., Real parties in Interest.

**COUNSEL**

De Witt W. Clinton, County Counsel, Auxiliary Legal Services, Inc., Gary P. Gross and Judith A. German for Petitioner.

No appearance for Respondent.

Linda R. Peck and Mitchell L. Beckloff for Real Parties in Interest.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

This petition for a writ of mandate was filed by the Los Angeles County Department of Children and Family Services (Department) in a dependency

matter in the following context. Parental rights had been terminated. Department requested that the minor, who was then living with prospective adoptive parents in Oregon, be returned to the care of his foster mother in Los Angeles pending a decision on permanent placement. The foster mother had cared for the child almost his entire life. She had consistently expressed her interest in adopting him and had consistently received favorable evaluations about her care of him. The trial court denied Department's request. That denial was error. A trial court can only deny such a request if the Department has abused its discretion in making its decision. In this matter, the record fails to demonstrate Department's decision was an abuse of discretion. We therefore grant Department the requested relief.

### FACTUAL AND PROCEDURAL BACKGROUND

Paul C. (Paul) was born on December 1, 1995. At birth, both Paul and his mother Paula C. tested positive for cocaine. Five days later, the Department filed a petition. (Welf. & Inst. Code, § 300.)[1] That day, Paul was placed with a foster caretaker, Ms. B.

In proceedings not relevant to this action, Paul was declared a dependent of the court. The court ordered reunification services for his mother. Not only did she fail to comply but she lost contact with Department and the court. Throughout, Paul remained with Ms. B. where he did very well.

In September 1996, Department received a letter from Reverend Prinzing (Prinzing) who had previously placed Paula C.'s firstborn child with an adoptive family. The letter did *not* give the name of the family or provide any method by which to contact them. Prinzing indicated that Paula C. had asked his help in placing Paul with the family; that he had contacted the family; and that the family had expressed its desire to adopt Paul. That same month, Department received a similar letter signed by Paul's grandparents and great-grandmother. That letter also failed to offer any identifying information about the family. As developed later, the family is the G.'s who live in Oregon; many years prior, they had adopted a boy (Joshua) who is now 11 years old and shares the same mother (but not father) with Paul.[2]

In January 1997, Department brought the issue of the G.'s interest in adopting Paul to the court's attention in a report lodged for a hearing

---

[1] All subsequent statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] A few months prior to the receipt of these two letters, Department had received enigmatic and cryptic information about a possible adoption by a family who had earlier adopted a sibling of Paul's. The information came about in the following context. In early 1996, Department referred Paul to the South Central Los Angeles Regional Center to determine if

scheduled for that month. In addition to attaching copies of the above referenced letters, the report stated that in December 1996, Paul's mother, accompanied by Prinzing, came to the social worker's office, indicated she wanted Paul to be adopted by the G.'s, and gave the social worker the G.'s telephone number.

The January 1997 report also contained data about Paul's living situation with Ms. B. He appeared to be bonded to her and she provided "a safe, stable, and nurturing home for [him] and has expressed a strong desire to provide long term care for [him]." The report noted that Paul's mother had failed to comply with any court orders and therefore recommended termination of reunification services, termination of her parental rights, and adoption. The report attached an adoption assessment made in August 1996 which indicated that on July 2, 1996, Ms. B. had expressed interest in adopting Paul. The report indicated that Ms. B. still wished to adopt him.

At the January 24, 1997, hearing, the court found that reasonable reunification services had been offered; that Paul's mother had failed to comply; and that Department should now provide permanent placement services. The court specifically identified adoption ·as the permanent plan and set the matter for a section 366.26 hearing on May 22, 1997. Counsel for Paul requested Department to evaluate the G.'s home. The court ordered Department to "[i]nitiate an Interstate Compact [I]nvestigation of Adoptive Parents of Sibling; . . . Evaluate the adoptive home of ·the adoptive parents of minors biological sibling for placement, [Department] has discretion to place minor in that home." The court stated: "*[I]t's the intention of this court to place this child there if appropriate.*" (Italics added.) Lastly, the court appointed a member of the Los Angeles Child Advocates Office to be a court appointed special advocate (CASA) charged with acting in Paul's best interests, including investigating all pertinent circumstances and reporting the results of those investigations to the court.

The Interstate Compact on Placement of Children (ICPC) is codified in Family Code section 7900 et seq. Its purpose is to facilitate cooperation

---

he was eligible for that center's services based upon "a substantial handicapping condition." The determination was that he was not eligible. A report prepared by that center's contract service coordinator was forwarded to Department in June 1996. In a paragraph about Paul's family history, the report recited: "A report from the International Foster Family Agency dated 1/5/96 indicates the natural mother contacted the foster parent [Ms. B.] and told her there are 5 other siblings in foster placement. The foster mother [Ms. B.] indicated to me there is a male sibling that has been adopted out and is in Arizona [*sic*: Oregon]. The adoptive mother recently had a child of her own. Prior to this it was suspected she would adopt [Paul] to keep the boys together. If not, the current foster mother [Ms. B.] indicated she is interested in adopting [Paul]."

between participating states in the placement and monitoring of dependent children. (*In re Johnny S.* (1995) 40 Cal.App.4th 969, 974-975 [47 Cal.Rptr.2d 94].) As applied to this case, it means that before Paul could even visit the G.'s in Oregon as a preliminary step to possible adoption, Department had to notify the appropriate authorities in Oregon and receive from them a report that the proposed placement would not be contrary to Paul's interests. (Fam. Code, § 7901, art. 3, subds. (a), (b), & (d).)

In preparation for the May 1997 section 366.26 hearing, CASA filed with the court a very positive evaluation it had made of the G.'s. Attached was a detailed seven-page handwritten document from the G.'s whom Department had contacted in January 1997 about adopting Paul. The document chronicled the G.'s dissatisfaction with what they characterized as "the lack of, and incomplete, communication from [Department]."

Department's report submitted for the section 366.26 hearing indicated that Paul was still living with Ms. B. and that she "is extremely committed in providing for a stable and nurturing environment for the child. She is very caring in her approach towards the child and has helped him make significant developments in this home. The child is well bonded to [her] and appears very comfortable in his current placement." The report also noted the G.'s intent to adopt and stated that an Interstate Compact had been initiated to allow Paul to be placed with them "as a fosterchild pending adoption [by them]." The report then stated: "Though [Ms. B.] wishes to adopt this child she realizes the importance of uniting the child with his half sibling in Oregon and has agreed to help with the adoption process."

On May 22, 1997, the matter was called for the permanency planning hearing. After continuing that adjudication because insufficient notice had been given to Paul's mother, the court turned to the issue of the G.'s desire to adopt Paul. The court, after expressing its displeasure that there had yet been no compliance with the ICPC, issued the following order: "[Paul] may have vacation with the [G.'s] in Oregon, adoptive parents of half sibling. LA County to provide one way airfare for minor and roundtrip for an attendant from Los Angeles to Oregon. [Department] to provide progress report on 7/1/97 status of ICPC and of minor[']s vacation with the [G.'s]."

Department moved for reconsideration of the court's order permitting Paul to go to Oregon on the basis that Ms. B. had begun the adoption process and would have statutory priority over the G.'s because she had been Paul's foster mother almost his entire life. Department supported the motion with a report from the social worker which alleged, in pertinent part:

"CSW received this case in March 1997. According to Ms. [B.] she was given to understand by the previous CSW that the court had ordered [Paul] to be adoptively placed with his half sibling in Oregon in the hearing dated January 24, 1997. When this CSW visited Ms. [B.] she stated that she had always wished to adopt [Paul] and was upset with the presumed order of the court. On careful review of the case file for [Paul], it was observed that an initial adoption assessment was done on Ms. [B.] on 8/13/96. Further this file had an open applicant case in the name of Ms. [B.] when it was transferred to the present CSW. This application to adopt [Paul] had been filed on 3/4/97.

"CSW discussed this situation with her Deputy Regional Administrator Ms. Karen Sims and her supervisor Ms. Judi Anne Simmons. It appears that Ms. [B.] had been misinformed about her rights to be evaluated as a prospective adoptive parent for [Paul]. During home call made on 04/15/97, CSW addressed the issue of adoption with Ms. [B.] and explained to her about her rights to be evaluated as a prospective adoptive parent [of Paul].

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"CSW received a message from Ms. [B.] on 06/2/97 stating that she would like to proceed with the adoption of [Paul] and would like to be considered as a candidate for an adoptive homestudy.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Ms. [B.] is extremely motivated and has expressed a strong commitment to adopting [Paul]. She has provided the child with continuous care since he was 4 days old and has met his needs effectively. [Paul] inturn [sic] appears to be well bonded to his current caregiver and is progressing well in this placement."

The trial court summarily denied without a hearing Department's motion for reconsideration.

Department then filed a petition in this court to contest the trial court's decision to permit Paul to go to Oregon. (*Department of Children & Family Services* v. *Superior Court* (Oct. 1, 1997) No. B112800 [nonpub. opn.].)[3] The primary thrust of the petition was that there had not yet been compliance with the ICPC. Department also alleged that Ms. B., as Paul's life-long

---

[3]We take judicial notice of this court's file in that writ proceeding. (Evid. Code, § 452, subd. (d)(1).)

foster caretaker, wished to adopt him and had statutory preference over the G.'s who also sought to adopt him.

We issued a temporary stay order. After receiving further briefing, we issued an order on July 11, 1993, indicating our intent to grant a peremptory writ in the first instance on the issue of failure to comply with the ICPC. That order further stated: "The contemplated peremptory writ will not concern the separate issue of adoption priority and suitability as between the foster mother and other candidates." Thereafter, the ICPC was complied with when a "Family Home Study" of the G.'s was filed in the trial court in September 1997. Accordingly, on October 1, 1997, we denied the writ and vacated the stay order. (*Department of Children & Family Services* v. *Superior Court, supra*, No. B112800.)

At a hearing conducted on October 8, 1997, the trial court acknowledged our October 1 order. The court stated: "[T]herefore, the temporary stay ordered by the appellate court is lifted and the prior order of this Court is in full force and effect. So Paul should now be transferred to his out-of-state prospective adoptive parents in Oregon." The G.'s, who had visited Paul twice in late September 1997, picked him up on October 9 and on October 10 returned to Oregon.

On November 6, 1997, a hearing was conducted resulting in the termination of Paula C.'s parental rights to Paul and the identification of adoption as the permanent plan. Paula C. has not contested those rulings. A debate ensued as to where to place Paul who was still in Oregon with the G.'s. Department recommended that he return from Oregon and be placed with Ms. B. who wished to adopt him. The matter was continued a day to resolve that issue.

On November 7, 1997, Department and counsel for Ms. B. sought return of Paul from Oregon and placement with Ms. B., pending finalization of her adoption of him. Department urged that it was up to Department, not the trial court, to select the adoptive parent(s) and that the trial court could only overrule the Department's selection if it constituted an abuse of discretion. The attorney appointed to represent Paul argued he should remain in Oregon and be adopted by the G.'s. CASA urged Department's position was an abuse of discretion.

The court issued the following order: "The court orders that Paul not be removed from his current caretakers Mr. and Mrs. [G.] in the State of Oregon barring an emergency. It is not an emergency that the Department may have exclusive control as to the placement of the child. The basis for

the decision is as follows: This child, Paul—let me start otherwise. The caretakers of a biological sibling of Paul, Mr. and Mrs. [G.], who reside in Oregon, stated a long time ago that they desired to have Paul placed with them and that they would like to adopt him. This is what the mother wanted also. She was in full agreement that Paul should be placed with his biological sibling and Mr. and Mrs. [G.]. Ms. [B.] agreed with that. But for delays in completing the home study and interstate compact, Paul would have been within the [G.]'s home months and months ago. The court is aware that DCFS has exclusive control as to the specific adoptive placement; however, here the court finds there are extenuating circumstances. DCFS delayed in submitting the completed interstate compact in a timely manner. Ms. [B.], although she originally was in agreement that the child should go to Oregon, later changed her mind. The court must address that. And the court likens that to appellate court decisions when the court is addressing whether or not a child should wait for his biological or legal parents to verify stability and compliance to have the child returned. When you're terminating reunification services or in terminating parental rights, the court has stated clearly that a child need not wait for a parent to get their life together to get the child back in their home. This child does not have to wait and did not have to wait for Ms. [B.] to change her mind. She has gone from supporting the placement of Paul with the [G.'s] to requesting that Paul remain with her. It is a significant factor for the court to balance in rendering its decision the question of what is in the child's best interest. This child is not a ball to be tossed back and forth from one caretaker to another. It has been the intention all along to place this child with the [G.'s] by all parties, I do believe. Of course, that placement could not occur until the completed interstate compact was submitted. The interstate compact has been approved. The appellate court's stay has been lifted. The child has been transported. The child has been observed by our CASA when our CASA visited Paul and the [G.'s] in October. All indications are that Paul is doing extremely well and has made a very satisfactory adjustment. The court finds that it is in his best interest to not be uprooted once again. The Department shall provide permanent placement services until the final order of adoption is granted."

This petition by Department followed seeking to vacate the trial court's order denying its request that Paul be returned from Oregon to the care of Ms. B. pending permanent placement.[4] We issued an alternative writ of mandate and placed the matter on calendar. We deemed the G.'s to be real

---

[4]Counsel for Ms. B. has filed a joinder to Department's petition.

parties in interest in this proceeding;[5] they have filed a lengthy answer to the petition[6] as well as a demurrer.[7] We, however, did nothing to change Paul's residence pending determination of this matter. Our order specifically provides: "The Alternative Writ does not [a]ffect any stay of respondent's October 8, 1997 order directing visitation of the minor in Oregon and does not authorize petitioner to return the minor to California during the pendency of this mandate proceeding."

## DISCUSSION

We begin by noting what is not at issue in this writ petition: the question of who should adopt Paul, Ms. B. or the G.'s.[8] Instead, we are presented with a much more narrow issue: with whom shall Paul be placed pending the adoption decision? In resolving this question, we are greatly assisted by a recent decision from the Court of Appeal, *Department of Social Services* v. *Superior Court* (1997) 58 Cal.App.4th 721 [68 Cal.Rptr.2d 239]. That court concisely analyzed the governing statutes as follows: "[T]he Legislature has granted the agency to which a minor is referred for adoption, in this case DSS, the 'exclusive' custody, control and supervision of the minor referred for adoptive placement. (Welf. & Inst. Code, § 366.26, subd. (j); Fam. Code, § 8704.) This exclusive authority includes the 'discretion' to place the minor in, and if necessary remove the minor from, a prospective adoptive home or 'temporary care,' i.e., foster care placement for the minor pending adoptive placement. (Fam. Code, § 8704.) Under the statutory scheme, DSS's discretion regarding adoptive and interim foster care placement is not unfettered. The juvenile court retains jurisdiction over the minor

[5]Subsequent to our issuance of the alternative writ, the trial court granted the G.'s motion for de facto parent status.

[6]CASA has joined in the answer and demurrer filed by the G.'s.

[7]The sole basis of the demurrer is that Department did not verify its petition. We overrule the demurrer by adhering to those cases which have held that Code of Civil Procedure section 446, which exempts public entities from the requirement of verifying pleadings, applies to a petition for a writ of mandate. (See, e.g., *Murrietta Valley Unified School Dist.* v. *County of Riverside* (1991) 228 Cal.App.3d 1212, 1221-1223 [279 Cal.Rptr. 421].)

[8]Because who should adopt is not in issue, there is no need to discuss the applicability of section 366.26, subdivision (k) which provides: "Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that minor over all other applications for adoptive placement if the agency making the placement determines that the minor has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the minor's emotional well-being. [¶] As used in this subdivision, 'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the minor."

to ensure the adoption is completed as expeditiously as possible and to determine the 'appropriateness of the placement.' (Welf. & Inst. Code, § 366.3.) This does not mean the court may substitute its independent judgment for that of DSS because the Legislature has given the agency exclusive custody and control of the minor and the discretion to make placement decisions. Rather, the court is limited to reviewing whether DSS abused its discretion in placing the minor or in determining that the placement, once made, remains appropriate. Absent a showing that DSS's placement decision is patently absurd or unquestionably not in the minor's best interests, the court may not interfere and disapprove of the placement." (*Id.* at pp. 724-725.)

Thus, the issue for us is simply whether given this statutory scheme, the trial court properly rejected Department's request that Paul be placed with Ms. B. pending adoption. We find the trial court's rejection of that request was error because the trial court improperly substituted its judgment for that of Department. Or stated another way, because Department's decision to place Paul with Ms. B. pending adoption was not an abuse of discretion, the trial court was not free to deny Department's request.

The G.'s first present several lengthy arguments attacking the constitutionality of the statutory scheme. None of these arguments was raised in the trial court. Although we have the discretion to consider these arguments for the first time in this writ proceeding (see, e.g., *Bonner* v. *City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1476-1477 [53 Cal.Rptr.2d 671], and cases cited therein), we decline to do so notwithstanding the fact that our dissenting colleague chooses to address those arguments and finds them persuasive.

The G.'s next urge the statutes do not apply to this situation because what is in issue is an order made *before* parental rights had been terminated, to wit, the trial court's May 1997 order that Paul visit the G.'s in Oregon, and at that point section 366.26, subdivision (j) had not yet vested exclusive placement authority in Department. The argument misses the mark. The order contested by the present petition is the trial court's November 7, 1997, order *denying* Department's request, made *after* parental rights had terminated, that Paul be returned from Oregon. The fact that the genesis of this dispute is the May 1997 order is of no moment given the clear statutory mandate empowering Department to place the child after parental rights had terminated. The effect of the trial court's November 7, 1997, order is to deny Department the ability to implement that statutory authority and that is the order contested in the present proceeding.

None of the reasons given by the trial court in its decision, set forth verbatim above, to permit Paul to remain with the G.'s demonstrate that

Department manifestly erred in determining that Paul should be returned to Ms. B.'s care pending adoption.

The trial court's belief that Ms. B. had unreasonably equivocated about whether or not she wished to adopt Paul is not supported by the record. Ms. B. indicated her desire to adopt Paul in July 1996 and then again in August 1996. Department's January 1997 report reaffirmed Ms. B.'s intent to adopt. Department's May 1997 report noted Ms. B. still wished to adopt but apparently had accepted the fact that the G.'s would adopt. Ms. B.'s state of mind was clarified by Department's June 1997 report which explained that Ms. B. had been misinformed that the trial court had already ruled that the G.'s would adopt instead of her and that once this misunderstanding was clarified, she adhered to her intent expressed as early as summer 1996 that she wished to adopt Paul. In their answer to this petition, the G.'s advance a lengthy argument attacking Ms. B.'s credibility and her interest and intent in adopting Paul. This argument also misses the mark. It was Department's responsibility, whose personnel met many times with Ms. B., to evaluate her interest in adopting Paul. It was Department's responsibility to determine if, at any point(s), Ms. B. had been misinformed about her options. Department, based upon all of the information presented, concluded Ms. B. had consistently voiced an intent to adopt. On this record, that decision cannot be characterized as an abuse of discretion. Consequently, the trial court erred in substituting its judgment of Ms. B.'s intent for the Department's judgment.

The trial court's statement that Paul's birth mother had expressed her intent that Paul be adopted by the G.'s was legally irrelevant. By this juncture her parental rights had been terminated, thereby eliminating her standing to participate in the proceeding. (See *In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806-1807 [54 Cal.Rptr.2d 560].) In any event, this fact (the preference expressed by the birth mother for the G.'s) as well as the fact that the G.'s expressed interest in January 1997 in adopting Paul is insufficient to establish Department abused its discretion in concluding that Paul should be placed with Ms. B. pending the decision as to who would adopt him.

The trial court also stated that Department had unreasonably delayed in implementing the ICPC. In their answer to the petition, the G.'s place great emphasis on this argument to urge Department's decision was an abuse of discretion.[9] The argument is unpersuasive. The G.'s present absolutely no authority for the proposition that Department's "unreasonable delay" (a fact

---

[9]When the G.'s filed their answer to the petition, they also lodged several exhibits. Included in those exhibits are some documents, such as a declaration from Ms. G., which were *not* in

we do not assume) has any legal connection to the trial court's ability to overturn Department's discretionary decision as to where Paul should be placed pending adoption.

In a similar vein, we reject the G.'s argument that "the basis for the Department's placement decision is not Paul's best interests [because] Paul (as well as the G.'s) are at the center of a power struggle between the Department and the juvenile court. . . . [¶] . . . The 'placement decision' of the Department is not about Paul. It is about the Department exerting its exclusive power and ensuring that the juvenile court does not encroach upon such power again." Putting aside the point that this argument is grounded on speculation as opposed to fact, the real issue is whether the trial court could conclude that Department abused its discretion in seeking to place Paul with Ms. B. pending adoption. As explained above, the trial court could not reasonably reach that decision.

In sum, the trial court erred because it substituted its own judgment for that of Department when it denied Department's request that Paul be brought back from Oregon and returned to Ms. B.'s care. Ms. B. had consistently indicated her intent to adopt Paul. Ms. B. had consistently received very favorable evaluations while acting as Paul's foster parent. Because parental rights had been terminated, Department had the discretion to decide with whom Paul should live until the final adoption decision was made. This record cannot and does not support the conclusion that Department's decision to place Paul with Ms. B. was an abuse of discretion.[10] It therefore follows that the trial court erred in denying Department's request that Paul be returned to Los Angeles. We will issue a writ of mandate compelling the trial court to grant Department's request.

So that there is no misunderstanding about the scope of this decision, we reiterate a point made earlier. Nothing in this opinion should be construed as expressing any view as to who the adoptive parent(s) should be. That determination remains to be made subject to the governing law. (§§ 366.26, subds. (e), (j), & (k), 366.3, subd. (a); Fam. Code, §§ 8714-8720; and Cal. Rules of Court, rule 1466(a).)

---

front of the trial court when it made the ruling contested by this petition. The G.'s rely upon some of the data in those documents to support the argument of unreasonable delay by Department in implementing the ICPC. Although Department has formally moved to strike those exhibits, we simply disregard, as we must, the documents not presented to the trial court. (*Floveyor Internat., Ltd.* v. *Superior Court* (1997) 59 Cal.App.4th 789, 796-797 [69 Cal.Rptr.2d 457], and cases cited therein.) We note, however, that much of this information was already contained in a report CASA submitted for the May 1997 hearing.

[10]We have examined the remainder of real parties' arguments as to why we should deny the petition. None of the arguments has merit and none merits discussion.

## DISPOSITION

Let a peremptory writ of mandate issue compelling respondent court to set aside its order of November 7, 1997, denying Department's request that Paul be returned to the care of Ms. B. in Los Angeles, California, pending permanent placement and to enter a new and different order granting that request.

Hastings, J., concurred.

**BARON, J.,** Concurring and Dissenting.—I concur in part and dissent in part. I agree with the majority that the question of whether Cordelia B. or Mr. and Mrs. G. should adopt Paul is not at issue in this writ petition, and I too conclude that the juvenile court should be directed to vacate its order denying the Los Angeles County Department of Children and Family Services' (DCFS) request to transfer Paul from the G.'s home to Cordelia B.'s home. However, I reach this conclusion on different grounds, and my reasoning leads me to dissent in part from the relief ordered by the majority.

The attack on the constitutionality of Welfare and Institutions Code section 366.26, subdivision (j),[1] made by Paul, the G.'s, and the court appointed special advocate (CASA) persuades me to diverge from my colleagues' views. Substantial justice calls out for this court to consider arguments on the important constitutional issue involved in this case, even though it was not raised before the juvenile court. (See *Bonner* v. *City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1476-1477 [53 Cal.Rptr.2d 671].)

Children like Paul who have been freed for adoption are not chattels, and we should not lose sight of their deepest interests in the thicket of conflicts surrounding their adoption. (See *In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1506-1507 [49 Cal.Rptr.2d 507].) Paul has fundamental and constitutionally protected interests in his relationships with families to which he has emotional ties (*ibid.*), and hence a due process right to a *meaningful* voice in decisions that affect these interests. In my view, the gravity of his constitutional concerns requires us to hear his voice in this court.

Paul must be heard in the juvenile court as well. The decision about where Paul resides pending his permanent adoptive placement may have a significant impact on the ultimate adoptive decision in his case. It is my position that, because Paul has a fundamental interest in where he will be placed pending the final adoption decision in his case, that he was entitled to an

---

[1]All further statutory citations are to this code unless otherwise indicated.

evidentiary hearing in which the parties were accorded the right to present supporting and rebutting evidence, and to receive a ruling based on the juvenile court's independent assessment of that evidence. The record reflects that Paul requested such a hearing, and that the juvenile court denied this request. Although it granted Paul's request to remain in the G.'s home, the court did so based upon its personal judgment, uninformed by the totality of the evidence upon which judges reach objective well-reasoned decisions.

Therefore, it is not surprising that the record and the oral arguments of the parties before this court disclose serious and unresolved factual disputes which we, as an appellate court, cannot settle. Accordingly, the juvenile court's order must be vacated.

I further conclude that the majority's order mandating the juvenile court to grant DCFS's request to return Paul to the care of Cordelia B. in Los Angeles, based upon its interpretation of subdivision (j) of section 366.26, violates Paul's right to procedural due process concerning his fundamental interests. I think subdivision (j) is constitutionally infirm unless it permits Paul an evidentiary hearing and independent judicial review of DCFS's request. Accordingly, I would direct the juvenile court to vacate its order and reconsider the matter after an appropriate evidentiary hearing.

A. *Due Process*

The majority concludes that DCFS did not abuse its discretion in deciding to return Paul to Cordelia B.'s home, and that the juvenile court improperly failed to defer to DCFS's request. Citing *Department of Social Services* v. *Superior Court* (1997) 58 Cal.App.4th 721 [68 Cal.Rptr.2d 239] (hereafter *Theodore D.*), the majority reasons that section 366.26, subdivision (j), mandates *deferential* review of DCFS's placement decisions by the juvenile court.

Subdivision (j) of section 366.26, as so understood, denies Paul procedural due process because it bars him from meaningfully litigating DCFS's temporary placement decisions, which in turn, can critically impact the final adoptive decision in his case. The federal and state Constitutions "guarantee that no state shall deprive any person of life, liberty or property without due process of law" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826]), although the state due process clause sweeps more broadly than the analogous federal clause (*San Jose Police Officers Assn.* v. *City of San Jose* (1988) 199 Cal.App.3d 1471 [245 Cal.Rptr. 728]).

Under the federal Constitution, the guarantee of due process "requires notice and an opportunity to be heard before an individual suffers governmental deprivation of a fundamental interest. Entitlement to procedural

protections depends upon the extent to which 'grievous loss' is threatened; it requires the court to weigh the individual's interest in avoiding the loss against the governmental interest in summary adjudication. The opportunity for hearing must precede, not follow, the deprivation, except for extraordinary occasions where some valid governmental interest justifies summary deprivation. The formalities and procedural requisites for the hearing may vary according to the quality of the governmental function, the character of the private interest and the nature of the subsequent proceedings." (*C.V.C.* v. *Superior Court* (1973) 29 Cal.App.3d 909, 915-916 [106 Cal.Rptr. 123], fns. omitted.)

Here, subdivision (j) of section 366.26 provides that once a minor is declared free of parental custody and control, DCFS "shall be responsible for the custody and supervision of the minor and shall be entitled to the exclusive care and control of the minor at all times until a petition for adoption is granted." Under section 366.3, subdivision (d), the minor in a preadoption placement may petition for reviews at six-month intervals to assess "[t]he appropriateness of the placement." (§ 366.3, subd. (e)(1).)

In *Theodore D.*, *supra*, 58 Cal.App.4th at page 733, the court reasoned that this statutory language was clear and evidenced the Legislature's intent "to defer to DSS's expertise once parental rights have been terminated and a child is referred for adoption." The court thus concluded that "prior to the filing of a petition for adoption, [an agency such as DCFS] may change an adoptive placement at its discretion," and that "the juvenile court is limited to reviewing whether [the agency] abused its discretion in placing the minor or in determining that the placement, once made, remains appropriate. [Citation.]" (*Id.* at pp. 733, 734.)

That subdivision (j) of section 366.26, as so interpreted, denies Paul due process is evident when viewed in context with *C.V.C.* v. *Superior Court*, *supra*, 29 Cal.App.3d 909. In *C.V.C.*, a county welfare agency placed an 18-month-old girl with the C.'s as prospective adoptive parents. (See *id.* at p. 912.) The agency then decided to remove the girl from the C.'s' home pursuant to former Civil Code section 224n, a predecessor of Family Code section 8704, which granted the agency "custody and control" over children freed for adoption, and the discretion to terminate a placement for adoption " 'at any time prior to the granting of a petition for adoption.' " (29 Cal.App.3d at p. 914 & fn. 3.) The superior court denied the C.'s' writ petition, reasoning that its role was limited to reviewing the agency's actions for abuse of discretion. (*Id.* at p. 914.)

The court in *C.V.C.* concluded that former Civil Code section 224n denied the C.'s procedural due process under the federal Constitution because, inter

alia, judicial review for abuse of agency discretion did not give adequate protection to the C.'s' interest as prospective adoptive parents. (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at pp. 915-920.) The court reasoned that this interest was "fundamental" due to "its effect in human terms and its importance to [their] life situation": "Gain of a child for adoption fulfills the prospective parents' most cherished hopes. The event marks the onset of a close and meaningful relationship. The emotional investment does not await the ultimate decree of adoption. Love and mutual dependence set in ahead of official cachets, administrative or judicial. The placement initiates the ' "closest conceivable counterpart of the relationship of parent and child." ' [Citation.] To characterize enforced removal of the child as a 'grievous loss' is to state the obvious." (*Id.* at p. 916, fn. omitted.)

The *C.V.C.* court recognized that the state had a weighty interest in promoting the interests of children through agency action. It determined that former Civil Code section 224n expressed a firm legislative design "to elevate the placement agency's discernment of danger above the interests of the prospective parents." (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 916.) Nonetheless, the *C.V.C.* court held that due process entitled the C.'s to "a 'limited' trial de novo" and independent judicial review of the agency's determination.[2] (*Id.* at pp. 916, 919-920.)

The court in *Marten* v. *Thies* (1979) 99 Cal.App.3d 161, 168, 171 [160 Cal.Rptr. 57] adopted *C.V.C.*'s analysis to "guard against the possibility of arbitrary agency action," by holding that a juvenile court "correctly applied the independent judgment test in weighing the evidence" of an agency's decision in removing a child from her preadoptive home even though former Civil Code section 224n gave the adoption agency "exclusive custody and control of the child at all times until a petition for adoption has been granted." Similarly, in *Jinny N.* v. *Superior Court* (1987) 195 Cal.App.3d 967, 972-973 [241 Cal.Rptr. 95], the court followed *C.V.C.*, even though

---

[2]In my discussion I have substituted "evidentiary hearing" as a more accurate term than " 'limited' trial de novo." As the *C.V.C.* court explained: "Relative to the permissible range of evidence, the hearing should not be beclouded by decisional references to a 'limited' trial de novo. Such references occur in the context of judicial review after a formal administrative hearing decreed by statute or regulation. (See *Bixby* v. *Pierno* [(1971)] 4 Cal.3d [130] at p. 143 [93 Cal.Rptr. 234, 481 P.2d 242]; cf. Code Civ. Proc., § 1094.5, subds. (a), (d).) They are designed to prevent a party from making a skeleton showing at the administrative hearing to be fleshed out later in court. (*Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 795 . . . .)" (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 920.) In *C.V.C.,* as in the present case, ". . . no administrative hearing was prescribed, none occurred and no evidentiary record was created. Absent such a record, the court should receive and consider any competent evidence produced by either side. (*Dare* v. *Bd. of Medical Examiners, supra,* 21 Cal.2d at pp. 797-798.)" (*C.V.C.* v. *Superior Court, supra,* at p. 920.)

Civil Code former section 224n uses language tracking subdivision (j) of section 366.26, to accord agencies "exclusive custody and control" of pre-adoptive children[3] by holding that "prospective adoptive parents are constitutionally entitled to notice and hearing if an agency seeks to remove a child from their home even *before* a formal petition for adoption has been filed. [Citation.]" (195 Cal.App.3d at p. 971, original italics.)

In view of *C.V.C.* and its progeny, Paul, too, is entitled to an evidentiary hearing and independent judicial review of DCFS's proposal to return him to Cordelia B. provided he has a suitably fundamental interest in his placement with the families that wish to adopt him. Although no court has squarely addressed this issue, several courts have stated that placing a child in long-term foster care or a prospective adoptive home implicates the child's independent and fundamental interests. Closest to point is *In re Bridget R., supra,* 41 Cal.App.4th 1483, in which the court confronted a federal law granting Indian tribes jurisdiction over custody proceedings involving Indian children. (*Id.* at pp. 1496-1498.) The court declined to apply the law to twins in a prospective adoptive home, reasoning that the twins had a fundamental and constitutionally protected interest in their relationship with the only family they had ever known. (*Id.* at pp. 1507, 1511-1512.)

The Supreme Court in *In re Jasmon O.* (1994) 8 Cal.4th 398 [33 Cal.Rptr.2d 85, 878 P.2d 1297], a case pitting a father against a child's long-term foster parents, recognized that "[c]hildren, too, have fundamental rights—including the fundamental right to be protected from neglect and to 'have a placement that is stable [and] permanent.' [Citations.]" (*Id.* at p. 419.) Likewise, in *In re Arturo A.* (1992) 8 Cal.App.4th 229 [10 Cal.Rptr.2d 131], the court "adopt[ed] the proposition that a child has a constitutional right to a reasonably directed early life, unmarred by unnecessary and excessive shifts in custody" although it had "difficulty in finding any specific authority for this proposition." (*Id.* at p. 241, fn. 6.)

In addition, siblings may have a fundamental interest in living in the same family in order to preserve their relationships with one another. (*In re Devin*

---

[3]Former Civil Code section 224n, subdivision (a) read as follows: " 'The department or licensed adoption agency to which a child has been freed for adoption by either relinquishment or termination of parental rights shall be responsible for the care of the child, *and shall be entitled to the exclusive custody and control of the child until either an interlocutory decree of adoption or a final decree of adoption has been granted.* Any placement for temporary care, or for adoption made by the department or a licensed adoption agency, *may be terminated at its discretion at any time prior to the granting of an interlocutory decree of adoption or final decree of adoption.* In the event of termination of any placement for temporary care or for adoption, the child shall be returned promptly to the physical custody of the agency.' " (*Jinny N.* v. *Superior Court, supra,* 195 Cal.App.3d at p. 971, fn. 3, italics added.)

*M.* (1997) 58 Cal.App.4th 1538, 1541 [68 Cal.Rptr.2d 666]; *In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1562 [49 Cal.Rptr.2d 200].) The Legislature has made it abundantly clear that separating siblings is presumptively detrimental to their best interests. (§ 16002.)[4] I read section 16002 to mean that dependent children have a fundamental interest in maintaining a relationship with their siblings in a common home, unless "sibling interaction is detrimental to a child or children." (§ 16002, subd. (b).) Accordingly, separated siblings can suffer a " 'grievous loss' " that entitles them to the same due process rights as prospective adoptive parents. (See *C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 916.)

Here, Paul has emotional relationships with two loving families that want to adopt him, and one of these families includes Paul's sibling. The choice between these families will permanently shape the contours of his life. The "effect [of this choice] in human terms and its importance to [Paul's] life situation" is unmistakable. (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 916.) Under *C.V.C., Bridget R.,* and the other authority described above,

---

[4]Section 16002 states in pertinent part: "(a) It is the intent of the Legislature to maintain the continuity of the family unit, and ensure the preservation and strengthening of the minor's family ties by ensuring that when siblings have been removed from their home, either as a group on one occurrence or individually on separate occurrences, the siblings will be placed in foster care together, unless it has been determined that placement together is not in the best interest of one or more siblings. The Legislature recognizes that in order to ensure the placement of a sibling group in the same foster care placement, placement resources need to be expanded.

"(b) The responsible local agency shall make a diligent effort in all out-of-home placements of dependent children, including those with relatives, to maintain sibling togetherness and contact. When maintaining sibling togetherness is not possible, diligent effort shall be made, and a case plan prepared, to provide for ongoing and frequent interaction among siblings until family reunification is achieved, or, if parental rights are terminated, as part of developing the permanent plan for the child. If the court determines by a preponderance of the evidence that sibling interaction is detrimental to a child or children, the reasons for the determination shall be noted in the court order, and interaction shall be suspended.

"(c) When there has been a judicial suspension of sibling interaction, the reasons for the suspension shall be reviewed at each periodic review hearing pursuant to Section 366. When the court determines that sibling interaction can be safely resumed, that determination shall be noted in the court order and the case plan shall be revised to provide for sibling interaction.

"(d) If the case plan for the minor has provisions for sibling interaction, the minor, or his or her parent or legal guardian shall have the right to comment on those provisions.

"(e) By February 1, 1995, the State Department of Social Services shall conduct a study, including the review of existing licensing laws and regulations, to identify barriers that limit the placement resources available for sibling groups and to develop solutions to those barriers. The study shall include exploring the feasibility of providing incentives to foster parents to ensure their availability to accept sibling groups, and providing support services to foster parents and relatives that would enable them to accept sibling groups. The study shall also explore appropriate alternatives to placement of siblings.

"(f) For the purpose of placement and visitation 'sibling' is defined as sister, brother, half-sister, half-brother, or as appropriate, stepsister or stepbrother."

he has a fundamental interest in the decisionmaking process and its outcome. Thus, Paul is entitled to have the juvenile court conduct an evidentiary hearing and independently review DCFS's placement decision.[5]

I think the majority misplaces its reliance on *Theodore D.* In *Theodore D.* the department of social services placed five siblings freed for adoption in two different homes pending adoption. The court-appointed counsel for some of the siblings sought their placement in a single home. (58 Cal.App.4th at pp. 725-730.) Following an evidentiary hearing, the juvenile court ordered the siblings placed in a single home. (*Id.* at pp. 730-731.) The appellate court reversed the juvenile court, distinguished *C.V.C.*, and rejected constitutional challenges to section 366.26, subdivision (j), holding that the Legislature had placed the children in the "exclusive control" of the agency and citing the siblings' failure to show that they had a fundamental interest in living in a single home. Under its statutory analysis, the appellate court held that the juvenile court improperly failed to review the agency's decisions under the abuse of discretion standard. (58 Cal.App.4th at pp. 734-737, 741-743.)

For the reasons cited above, I disagree with *Theodore D.* insofar as it held that sibling relationships are not "akin to a parent-child relationship," and rejected *C.V.C.*'s "judicial review of the agency's decision . . . using the independent judgment standard" because the siblings in question were not being removed from the home of prospective adoptive parents. In my opinion, the relationships among the siblings in *Theodore D.* helped bind together the "only family they had ever known" prior to their placement in separate foster homes. (See *In re Bridget R., supra,* 41 Cal.App.4th at p. 1507.) Given the interest at stake, I think the juvenile court in *Theodore D.* properly conducted an independent review of the agency's decision to divide the group of siblings between two foster homes. The appellate court failed to recognize that the siblings' fundamental interests were impacted by that agency's decision. Thus, too, the appellate court erred in its standard of review. It should have limited its review of the juvenile court's decision to the existence of substantial evidence. (See *Marten* v. *Thies, supra,* 99

---

[5]This conclusion is not disturbed by Paul's inability to articulate his interests. Paul has a court-appointed special advocate and guardian ad litem, and is represented by court-appointed counsel, charged by statute with advocating Paul's independent interests. (§ 317, subds. (c), (e).) At least two courts have recognized that permitting such counsel to challenge agency decisions and to present evidence concerning a minor's interests contrary to agency determinations promotes reliable assessments of the minor's welfare. (*Guadalupe A.* v. *Superior Court* (1991) 234 Cal.App.3d 100, 105-107 [285 Cal.Rptr. 570]; *Allen M.* v. *Superior Court* (1992) 6 Cal.App.4th 1069, 1073-1075 [8 Cal.Rptr.2d 259].)

Cal.App.3d at p. 171; cf. *Davis* v. *Civil Service Com.* (1997) 55 Cal.App.4th 677, 686 [64 Cal.Rptr.2d 121].)[6]

In sum, Paul has a fundamental interest in dwelling with his sibling, and in the decision to place him with one of the loving families that wish to adopt him. He is therefore entitled to independent judicial review of DCFS's transfer request based upon an evidentiary hearing at which all of the pertinent facts can be made known to the court.

### B. *Evidentiary Hearing*

Here, the juvenile court erred in substituting its independent judgment that the requested transfer was not in Paul's best interest, without holding a suitable evidentiary hearing in which the court properly weighed the evidence presented by DCFS, both prospective adoptive families, and the minor through his attorney and CASA. When, as here, the issue concerns placement pending adoption and "no administrative hearing was prescribed, none occurred and no evidentiary record was created . . . , the court should receive and consider any competent evidence produced by either side. [Citation.]" (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 920.)

The record discloses that DCFS framed its transfer request in terms of its authority under section 366.26, subdivision (j), and the statutory adoption

---

[6]Under this standard, the facts recited in *Theodore D.* raise the inference that substantial evidence did not support the juvenile court's determination because the juvenile court substituted its personal experience as an adopted child and an adoptive parent for the overwhelming evidence presented by the agency that placement of the siblings in one home was not in the best interest of any of the children and would actually be detrimental to all of them. (See *Theodore D., supra,* 58 Cal.App.4th at pp. 725-731.) "The objective of [the juvenile court in conducting a] de novo judicial review is not to supplant the adoption agency or to denigrate the expertise of trained social workers. Their decisions and their expert opinions should be received with respect. Rather, the objective is to prevent arbitrary judgments; to guard against placement terminations generated by the subjective inclinations of case workers and supervisors untaught in the analysis of evidence and not doctrinated in the concept of fair hearing; to promote fairness by interposing a law-trained judge between the agency and prospective parents [and minors]; to insure that the ultimate decision is firmly hinged to the only permissible criterion—the welfare of the child." (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 919, fn. omitted.)

In a caveat to the foregoing quotation, the *C.V.C.* court noted: "Realism, however, compels recognition of the following observation: 'Although adoption agencies are supposed to be guided solely by what is most beneficial to the child entrusted to them, it is only natural that they develop the conviction at times that their decisions and choices concerning a child's future are superior to those of others.' (Bodenheimer, [*The Multiplicity of Child Custody Proceedings—Problems of California Law* (1971)] 23 Stan.L.Rev. 703, 717, quoted in *San Diego County Dept. of Pub. Welfare* v. *Superior Court* [(1972)] 7 Cal.3d [1] at p. 10, fn. 4 [101 Cal.Rptr. 541, 496 P.2d 453].)" (*C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at p. 919, fn. 14.) It bears remembering that judges, too, are not immune from this natural tendency.

preference accorded foster parents such as Cordelia B. under section 366.26, subdivision (k). At the hearing on DCFS's request, Paul's counsel and CASA (who also serves as Paul's guardian ad litem) opposed the request, and CASA asked for an evidentiary hearing. The juvenile court declined to grant a hearing, and denied DCFS's request because, absent DCFS's delays, Paul would have been in the G.'s home before Cordelia B. decided to adopt Paul, and because it believed that it was in Paul's best interest to stay in the G.'s home.

Because no evidentiary hearing was held, the juvenile court's determinations rested on an undeveloped and conflict-ridden record. Regardless of the tangled proceedings prior to the hearing on DCFS's request, Paul is presently in Oregon living with the G.'s, and there is little or no evidence, merely the conflicting opinions of the parties, concerning the effects on Paul of returning him, or not returning him, to Cordelia B.

The record is similarly undeveloped with respect to DCFS's purported delays, Cordelia B.'s change of mind, and the proper applications of the statutory adoption preference in section 366.26, subdivision (k) and sibling preference in section 16002. The record suggests that as early as June 1996, DCFS was told that Paul's sibling had been placed in an adoptive home, yet DCFS appears to have delayed in following up on this information. Furthermore, when the G.'s told DCFS that they wished to adopt Paul in January 1997, they were informed that the requisite arrangements for Paul's transfer to them would be made in a month or six weeks, yet their phone calls to DCFS went unreturned and the Interstate Compact took several months to complete. Although DCFS reported to the juvenile court as late as May 22, 1997, that Cordelia B. had agreed to Paul's adoption by the G.'s, a subsequent report contains conflicting statements. In a report dated June 6, 1997, DCFS indicated Cordelia B. had filed an adoption application in March 1997, and that DCFS knew that she had been considering pursuing her application since April 1997, after a social worker discussed her rights with her. However, the juvenile court did not permit the evidence on these and related issues to be developed.

Because the parties were not given an opportunity to produce competent evidence on the issues pertinent to DCFS's transfer request, Paul was denied a constitutionally adequate evidentiary hearing on a matter of grave importance to him. I would direct the juvenile court to reconsider the matter and exercise its independent judgment on the transfer request following an

evidentiary hearing at which the juvenile court must "receive and consider any competent evidence produced by either side. [Citation.]" (*C.V.C.* v. *Superior Court, supra*, 29 Cal.App.3d at p. 920.)

A petition for a rehearing was denied April 6, 1998, and the petition of real parties in interest for review by the Supreme Court was denied June 10, 1998.