[No. C034955. Third Dist. Aug. 14, 2000.]

In re JULLIAN B., a Person Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
JOSETTE B., Defendant;
NORTH FORK RANCHERIA, Intervener and Appellant.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.*

## COUNSEL

California Indian Legal Services, John A. Maier, Jay B. Petersen, Stephen V. Quesenberry and Michael S. Pfeffer for Intervener and Appellant.

No appearance for Defendant.

Robert A. Ryan, Jr., County Counsel, and Renaldo P. Carboni, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

HULL, J.—In this appeal we address the impact of the preference requirements of the Indian Child Welfare Act (ICWA)[1] on the exercise of discretion by state or local agencies when placing Indian children in adoptive homes.

The mother and the minor are members of the North Fork Rancheria of Mono Indians of California (the Tribe). The Tribe appeals from the ruling of the juvenile court finding good cause to reject the placement preference order set forth in the ICWA and permitting the Sacramento County Department of Health and Human Services (DHHS) to place the minor with a

---

[1] See 25 United States Code section 1901 et seq.

non-Indian family.[2] (25 U.S.C. § 1915(a).) We reverse the order of the juvenile court, in part, and remand for further proceedings.

## FACTS

DHHS removed the 17-month-old minor from his mother's custody in April 1999 due to her history of substance abuse and a current arrest for driving under the influence. The mother is a member of the Tribe. The minor is the youngest of eight children, all of whom have been adopted or otherwise placed out of the mother's custody. Based upon expert opinion and the social worker's assessment, the court denied services to the mother in June 1999 and set a Welfare and Institutions Code section 366.26 hearing. (All undesignated statutory references are to the Welfare and Institutions Code.) The Tribe appeared at the jurisdictional/dispositional hearing and requested the minor be placed in conformity with the ICWA.

The assessment for the section 366.26 hearing, filed in October 1999, stated the social worker had contacted the Tribe and the Tribe had identified the minor's maternal great-uncle, Mr. S., as an appropriate extended family member with whom to place the minor. However, the social worker believed there was good cause not to place the minor with Mr. S. because (1) he was 71 years old and had not identified anyone to care for the minor if he became incapacitated; (2) he had a history of two criminal convictions adjudged 20 to 30 years earlier, the first for driving under the influence and the second for vehicular manslaughter factually based on an accident in which an infant died; (3) he continued to use alcohol after the manslaughter conviction and until 1985 when his medical condition required abstinence; (4) his sole "support system" was Ms. D., his 48-year-old girlfriend who parented both their son and her daughter from a prior relationship; and (5) the children raised by Mr. S. and Ms. D. had serious problems with their own children, including developmental delays of Ms. D.'s daughter's children due to the daughter's use of alcohol while she was pregnant. The Tribe did not identify any other relative or tribal member as a prospective adoptive placement.

The social worker had investigated without success several other possible placements, including the homes of the minor's siblings, in search of a nontribal Indian family placement. In the assessment, the social worker asked for a continuance to locate an adoptive placement for the minor.

On October 27, 1999, the court conducted a section 366.26 permanent plan hearing. At the hearing the court denied the social worker's request for

---

[2]The prospective adoptive father is said to be one-eighth Cherokee, but nothing in the record indicates he is an Indian within the meaning of the ICWA, i.e., a "person who is a member of an Indian tribe . . . ." (25 U.S.C. § 1903(3).) Accordingly, we conclude the prospective adoptive family does not fall within the preferences listed in the ICWA.

a continuance, terminated parental rights, bifurcated the question of placement and set a further hearing for November 30, 1999, to address the issue of placement. DHHS was ordered to continue to assess placement alternatives, and the parties were ordered to file points and authorities regarding the issues to be decided at the November 30 hearing.

Thereafter, DHHS filed its memorandum of points and authorities. The department argued it had exclusive authority to place the minor, subject only to review for abuse of discretion. In its memorandum, the Tribe disagreed and asserted that the ICWA controlled placement decisions. The Tribe argued that once it had designated an extended family member's home for placement of the minor, DHHS was required to place the minor according to that designation unless DHHS could show, by clear and convincing evidence, good cause not to do so.

In an appearance progress report filed prior to the November 30 hearing, DHHS documented further search efforts for a suitable Indian family. DHHS had located a young, active couple whom DHHS believed would be a good match for the minor. The husband was one-eighth Cherokee and was willing to connect the minor with the minor's own Indian heritage. DHHS recommended placement of the minor in this prospective adoptive home.

The Tribe responded with a home study prepared by a tribal representative which concluded Mr. S. and Ms. D. were an appropriate adoptive placement. The two had been together since 1973 and considered themselves married according to their Indian traditions. The tribal study contradicted information in the social worker's report, particularly in the areas of parenting and the health and well-being of the children and grandchildren of Mr. S. and Ms. D. The study detailed important tribal interests, noting that Mr. S. speaks the tribal language, has been a responsible member of the community for many years, is in good health and active despite his years and that he and Ms. D. participate in tribal activities. The tribal study noted that Fresno County previously had placed minor relatives in the home of Mr. S. and Ms. D. while Ms. D.'s sister was in an alcohol recovery program.

At the hearing on December 7, 1999, DHHS addressed the application of section 361.4, which bars placement by DHHS of a minor with a person who has been convicted of a crime, and addressed whether a waiver of the provision was available. DHHS represented that "in previous cases [DHHS] has contacted the state director of Social Services regarding this [type of] waiver. The state department's position is that they do not grant waivers and that they will grant a county the authority to waive. Sacramento County is not accepting that responsibility to grant a waiver under the [*sic*] section

361.4." DHHS observed that the Director of the Department of Social Services (DSS) and the county were "at an impasse." DHHS also objected to the Tribe's home study as hearsay and not approved under state regulation (Cal. Code Regs., tit. 22, § 35181).

The social worker informed the court Mr. S.'s manslaughter conviction occurred in September 1960, i.e., 40, not 20 to 30, years earlier as reported previously. The social worker also stated she relied on the state regulation governing the information required to be in an assessment of the prospective adoptive family in rejecting Mr. S. and Ms. D. as persons with whom the minor should be placed. The social worker believed Mr. S. would not pass a home study because (1) he has a felony conviction which involved the death of an infant even though the conviction was long ago; (2) Mr. S. failed to rehabilitate and continued to drink after the accident; (3) Mr. S. just laughed when questioned about his parenting practices; and (4) there was no indication Mr. S. would be an active parent.

The Tribe argued that the normal discretion of DHHS to place a child is constrained by the ICWA and that DHHS had to follow the statutory placement preference absent good cause to do otherwise. The Tribe contended DHHS had the burden to show by clear and convincing evidence that the distant felony conviction and other facts constituted good cause to deny the extended family placement but had not done so. The Tribe also noted it had adopted a resolution which designated Mr. S. and Ms. D. as the preferred placement and stated they were married under tribal law. The tribal representative explained that Mr. S. laughed in response to the social worker's questions about his parenting style because he was embarrassed by the question, which Mr. S. interpreted as asking for self-criticism. Critical self-judgment is not part of the tribal culture.

The referee took the matter under submission and issued a written ruling on December 20, 1999.

In the ruling, the referee accepted the Tribe's home study as a home study rather than a mere report. The referee found placement decisions were not within the exclusive control of DHHS and that DHHS was required to establish good cause to alter the ICWA preferences. The referee found that DHHS had, by clear and convincing evidence, met its burden to show good cause why the statutory preference should be "modified" by showing that Mr. S. had a felony conviction and that the application of section 361.4, which bars placement of the minor with Mr. S., had not been waived. The court also found that Mr. S. "may" not pass a home study and would be considered unsuitable on that basis too.

The referee denied as untimely the Tribe's request for a separate hearing to consider whether DHHS had made a diligent search for an Indian home but found, in any event, that DHHS had done so.

Counsel for the Tribe was informed on January 3, 2000, that, in response to a faxed copy of the court's order sent to DHHS on December 20, 1999, DHHS had moved the minor to the prospective adoptive home it had located previously.

The Tribe filed an application for rehearing pursuant to section 252. The juvenile court denied the rehearing on the ground the Tribe lacked standing to bring the application as it was not a party enumerated in section 252.

DISCUSSION

I

*The Indian Child Welfare Act and Its Relation to Other Statutes*

The Tribe contends the court erred in finding good cause to permit the minor to be placed in a non-Indian home. The Tribe asserts that, absent good cause to the contrary, its designation of a placement is controlling under the ICWA and must be followed by DHHS. The Tribe argues the court erroneously found good cause to avoid the preference because the finding was partially premised on DSS's refusal to exercise its discretion to waive the disqualifying provisions of section 361.4. It argues that, had DSS considered the circumstances of Mr. S.'s felony convictions and waived the provisions of section 361.4, the statutory impediment to placement of the minor with Mr. S. would have been overcome and the minor could then have been placed in accordance with the ICWA.

We begin with a discussion of the ICWA since it controls, in large part, the placement decision in this matter.

Based on findings that Indian children are a vital resource to the continued existence and integrity of Indian tribes and that the states, when exercising their jurisdiction over Indian child custody proceedings, "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," Congress enacted the ICWA to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ." (25 U.S.C. §§ 1901, 1902.) In enacting the ICWA, Congress intended to establish standards for removal and placement of Indian children which would "reflect the unique values of Indian culture . . . ." (25 U.S.C. § 1902.)

Thus, "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (25 U.S.C. § 1915(a).) ██ This order of preference may be altered by tribal resolution.[3] (25 U.S.C. § 1915(c).)

"The standards to be applied in meeting the preference requirements of [25 United States Code section 1915] shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties." (25 U.S.C. § 1915(d).)

The essential features of ICWA placement preferences and standards are set forth in California Rules of Court, rule 1439(k). The rule lists some of the factors that may support a finding of good cause, including "the unavailability of suitable families . . . meeting the preference criteria." (Cal. Rules of Court, rule 1439(k)(4)(D).) An Indian child may not be placed in a non-Indian home unless "the court finds that a diligent search has failed to locate a suitable Indian home." (Cal. Rules of Court, rule 1439(k)(3).)

██ Where the ICWA does not apply, the state or local agency charged with making adoptive placements, in this case DHHS, has exclusive authority to make placement decisions for the child, reviewable only for abuse of discretion. (*Department of Social Services v. Superior Court* (1977) 58 Cal.App.4th 721, 733-734 [68 Cal.Rptr.2d 239]; *Los Angeles County Dept. of Children, etc. Services v. Superior Court* (1998) 62 Cal.App.4th 1, 9-10 [72 Cal.Rptr.2d 369].) However, as the language of the ICWA demonstrates, in the case of an Indian child, the agency's discretion is confined and guided by the provisions of the ICWA and, if the agency selects a placement which does not comport with the preferences of the act, it must justify its decision by establishing good cause for refusal to do so.

As noted, these limitations on the agency's decision are set forth in the statute and carry forward the policies the ICWA seeks to achieve.

---

[3]The Tribe argues that its resolution designating Mr. S. and Ms. D. as an appropriate adoptive placement constitutes such a resolution. Since Mr. S., and his tribal wife, Ms. D., are members of the minor's extended family they already enjoy first preference under the statute. Thus, the tribal resolution does not constitute a change in the *order* of placement preferences but constitutes instead an attempt to *designate* a specific placement. The ICWA does not authorize the Tribe to do the latter, and section 1915(c) of title 25 of the United States Code, authorizing resolutions changing the *order* of preference, is inapplicable to this discussion.

The tribe also appears to rely on language in the statute relating to "least restrictive placement." (25 U.S.C. § 1915(b).) This language is appropriate for foster care placement but has no application to adoptive placements, since restrictive placement such as group homes and treatment centers are not adoptive placements.

■ Because Congress found that state agencies and courts were, in part, responsible for the problems identified by the statute, Congress sought by the statute's provisions to require a state to consider and respect the special circumstances of Indian families when determining the placement of Indian children during custody proceedings. (*Mississippi Choctaw v. Holyfield* (1989) 490 U.S. 30, 45 [109 S.Ct. 1597, 1606-1607, 104 L.Ed.2d 29, 44].) The point of the ICWA is to limit state agency discretion by requiring consideration of those family and cultural characteristics which are peculiar to the tribal society and, where possible, to place an Indian child in an Indian community. (*Id.* at pp. 35-37 [109 S.Ct. at pp. 1601-1602, 104 L.Ed.2d at pp. 38-39].) The good cause provision is designed to provide the courts with some flexibility in placement of the child. (*Matter of Custody of S.E.G.* (Minn. 1994) 521 N.W.2d 357, 362; *In re Alicia S.* (1998) 65 Cal.App.4th 79, 89 [76 Cal.Rptr.2d 121].)

In some cases, other statutes affect the placement decision. Under state law, before placing any child in a home, the agency must conduct a criminal record check. (§ 361.4, subd. (b).) If the check reveals that the individual with whom the child may be placed may have a criminal record and the agency still intends to place the child in that home, the agency must conduct a fingerprint clearance check. (§ 361.4, subd. (d)(1).) "If the fingerprint clearance check indicates that the person has been convicted of a crime that would preclude licensure under Section 1522 of the Health and Safety Code, the child shall not be placed in the home." (§ 361.4, subd. (d)(2).) However, "[u]pon request from a county, the Director of Social Services may waive the application of this section pursuant to the standards established in paragraph (1) of subdivision (g) of Section 1522 of the Health and Safety Code. The director shall grant or deny the waiver within 14 days of receipt of the county's request." (§ 361.4, subd. (d)(3).)

Health and Safety Code section 1522 requires a criminal background investigation of those who apply for licenses or permits to operate community care facilities. It provides, in part: "If the State Department of Social Services finds that the applicant . . . has been convicted of a crime other than a minor traffic violation, the application shall be denied, unless the director grants an exemption pursuant to subdivision (g)." (Health & Saf. Code, § 1522, subd. (a)(1).)

Subdivision (g)(1) of Health and Safety Code section 1522 says: "After review of the record, the director may grant an exemption from disqualification . . . if the director has substantial and convincing evidence to support a reasonable belief that the applicant and the person convicted of the crime, if other than the applicant, are of such good character as to justify issuance of the license or special permit . . . ."

██ The goals of ICWA and the disqualifying provisions of section 361.4 are not incompatible. The ICWA limits the agency's discretion in selecting a permanent placement for an Indian child. Thus, the agency must search diligently for a placement which falls within the preferences of the act and may reject a preferred placement only on a showing of good cause.

Where a prospective adoptive parent has suffered a criminal conviction that brings the person within the provisions of section 361.4, or where the adoptive household includes such a person, good cause may exist to reject a placement preferred by the act. However, in light of the purposes underlying the ICWA and its mandate, the agency must either ask for a waiver of the disqualifying provisions of section 361.4, or adequately support its reasons for not doing so if failure to request a waiver results in a placement that contravenes the ICWA preferences. In turn, in cases where a waiver is requested, the Director of DSS may not unreasonably deny such exemption, for to do so would necessarily frustrate goals the ICWA is intended to achieve.

## II

### *The Hearing in This Matter*

In this case, DHHS selected a non-Indian adoptive placement, having concluded there was no suitable placement within the preferences of the ICWA. DHHS relied upon both the assessment prepared for the section 366.26 hearing and the later progress report to establish good cause and to establish that it had been diligent in its search for a placement preferred by the act. DHHS also relied on the state regulations which set forth in detail the information that must appear in the assessment and how the assessment should be conducted. (Cal. Code Regs., tit. 22, §§ 35180, 35181.)[4]

The regulations require "at least 3 separate face-to-face contacts with each applicant for the purpose of interviewing the applicant for the assessment." (Cal. Code Regs., tit. 22, § 35181, subd. (a).) At least one interview must occur in the home and additional interviews may occur if necessary. (Cal.

---

[4]These regulations do not, in themselves, contain provisions requiring rejection of any particular applicant. The regulations only reiterate and amplify the kinds of information required to be in the assessment report prepared for the section 366.26 hearing. (§§ 366.21, 366.22.) Rejection of an applicant must be the result of the social worker's *evaluation* of the information gathered pursuant to statute and regulation; thus, evidence of mere compliance in gathering the information according to the regulations is insufficient to establish the existence of good cause to reject the placement. Of course, failure to follow the regulations could be evidence of a lack of good cause.

Code Regs., tit. 22, § 35181, subd. (a)(2)(A) & (2)(E).) The record discloses that the social worker's assessment of Mr. S. as a prospective adoptive parent was based on a single interview which occurred in the social worker's office.

The written assessment, although sparse, contains some of the required information, i.e., identifying information, blood relationship to the child, information on others living in the home, medical information and criminal history. All of the information in the assessment appears to be gathered from the interview itself. The assessment does not reveal an independent criminal screening, medical reports or references as required by the regulation. (Cal. Code Regs., tit. 22, § 35181, subd. (b)(9), (11) & (12).)

In rejecting Mr. S.'s application, the social worker considered his personal characteristics and current functioning as well as his reported criminal background, his commitment and capability of meeting the minor's needs, his support system, his plans for care of the minor in the event he should become incapacitated and his ability to assume permanent responsibility for the care of the child.[5]

The social worker expressed concerns about Mr. S.'s age, his inability to suggest a person who could care for the minor if he became incapacitated, his prior conviction for vehicular manslaughter of a child when he was driving under the influence, his failure to rehabilitate for many years after the accident, his health and his lack of support system which consisted only of Ms. D. The report does not, however, assess any of these factors in light of "the prevailing social and cultural standards of the Indian community in which" Mr. S. resides. (25 U.S.C. § 1915(d).)

At the hearing, the social worker reiterated that the felony conviction involving the death of an infant, coupled with Mr. S.'s failure to rehabilitate and the dearth of information about his own parenting skills, justified rejection of his application to adopt the minor.

The juvenile court also had before it the Tribe's assessment of Mr. S. that contained detailed information about Mr. S.'s support system, his importance as a tribal member and his rehabilitation from alcohol abuse. The Tribe's assessment accounted for the cultural aspects of the Indian community. The tribal assessment also appeared to meet some of the social worker's objections to Mr. S. as a placement although, as far as we can tell from the record, the social worker did not review her position in light of the new

---

[5]We note, in passing, that should Mr. S. be incapacitated, the minor could be placed with Ms. D., who is a tribal member and thus falls within the placement preferences of the ICWA.

information. As a result, the conclusions and some of the facts in the Tribe's assessment conflicted with those of the social worker.

If this case required only a resolution of conflicting facts, our inquiry into the finding of good cause would be different. (Cf. *In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16 [265 Cal.Rptr. 650].) However, the case requires more and we must look further.

██ The critical factor to the social worker and the court was the existence of Mr. S.'s felony conviction since, even if the other concerns of the social worker were calmed by the Tribe's information, the statutory bar to placement in the absence of an exemption made an extensive assessment of Mr. S. as an adoptive placement a pointless exercise.[6]

On this record, the court found that the DHHS had met its burden of showing good cause to modify the preference stating: "Welfare and Institutions Code [s]ection 361.4 is a specific Legislative command that certain placements not occur unless waivers are granted. Although remote, the convictions of [Mr. S.] are serious and *in the absence of a waiver*, the Legislature has directed No placement is to be made. *Here no waiver has been granted and therefore the Department of Health and Human Services is prohibited from placing [the minor] with [Mr. S.] This alone constitutes good cause.*" (Italics added, all capitalized words in original.)

The Tribe's complaint, well-founded, is that the court denied the preferred placement based on the disability imposed by section 361.4 even though none of the agencies involved considered whether a waiver may have been appropriate given all the facts of Mr. S.'s personal history.

Specifically, DHHS apparently decided not to request a waiver because DSS's "position is that they do not grant waivers . . . ." DHHS recognized that DSS "will grant a county authority to waive" but "Sacramento County is not accepting that responsibility . . . ." On this record, DHHS did not decide to forego a request for a waiver due to its own determination that the request would be without merit, but because, in its view, the request would be administratively futile regardless of merit.[7]

---

[6]It is likely that this fact explains the somewhat cursory assessment by the social worker, who was aware of the problems involved in securing such an exemption.

[7]As noted, according to DHHS, the Director of DSS does not grant waivers but will allow a county to do so. On this record we cannot determine whether that means the director simply will not accept applications for waiver or that waivers are invariably denied regardless of the circumstances of the individual case. This lack of clarity is of no moment, however, because

Thus, insofar as this record demonstrates, no one in authority considered whether the statutory disability that Mr. S. suffered by virtue of his conviction on serious charges 40 years earlier should be waived based on "substantial and convincing evidence" (Health & Saf. Code, § 1522, subd. (g)(1)) which would "support a reasonable belief that [Mr. S.] . . . [is] of such good character as to justify" (Health & Saf. Code, § 1522, subd. (g)(1)) removing the disability imposed by section 361.4, subdivision (d)(2).

We hold that, in order to establish good cause to avoid the placement preference of the ICWA where the applicant has a disabling criminal conviction, the agency must request a waiver pursuant to section 361.4, subdivision (d)(3), or explain why, based on the merits of the individual case and subject to review for abuse of discretion, it did not do so. If a waiver is requested and denied, the record must establish that the Director of DSS exercised sound discretion in denying the waiver and must set forth the reasons therefor. Anything less frustrates the purpose of the ICWA.

We add what may be obvious. The director's waiver of the disability is not by itself dispositive of the placement. It remains the juvenile court's responsibility to decide whether there is good cause to avoid the preferences of the ICWA and to determine a placement that is in the best interest of the minor.

In anticipation of further proceedings in this matter, we requested supplemental briefing on the question whether the Director of DSS could delegate the statutory authority to grant a waiver. In response to our request, both parties submitted briefs contending the plain language of the statute confers exclusive authority on the Director of DSS to determine whether, under the guidelines of Health and Safety Code section 1522, subdivision (g)(1), an exemption should be granted.

We agree with this analysis. ■ The plain language of both Welfare and Institutions Code section 361.4, subdivision (d)(3), and Health and Safety Code section 1522, subdivision (g)(1), places responsibility for waiving the application of section 361.4 squarely on the Director of DSS.[8] The Legislature has made no provision for delegation of this duty outside the DSS. At least one reason for restricting the power to grant exemptions to the director is immediately apparent. As DSS is the ultimate overseeing authority for approval of community care licenses and adoptive placements, the

either position by the director is an abuse of discretion. (See *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 222 [86 Cal.Rptr.2d 209]; *Richards, Watson & Gershon v. King* (1995) 39 Cal.App.4th 1176, 1180 [46 Cal.Rptr.2d 169].)

[8] We express no opinion on the question of whether the director may delegate to an employee whose actions are overseen by the director the actual task of reviewing and acting upon requests for exemptions.

director is uniquely positioned to ensure uniform statewide application of the grant or denial of exemptions. Such uniformity prevents "forum shopping" by prospective adoptive parents and licensees. Statewide oversight also prevents what appears to be a discrepancy between counties in placing minors in the home of Mr. S. if the information in the tribal assessment that Fresno County placed Ms. D.'s sister's children in the home is correct.[9]

### III*

*The Tribe's Other Contentions*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The order of the juvenile court is reversed insofar as the court found DHHS met its burden to establish good cause to place the minor outside the preferences of the ICWA. On that issue alone the case is remanded for further proceedings consistent with this opinion. In all other respects, the orders of the juvenile court are affirmed. Appellant shall receive its costs on appeal.

Davis, Acting P. J., and Callahan, J., concurred.

A petition for a rehearing was denied September 11, 2000, and the opinion was modified to read as printed above.

---

[9]After the date this opinion was filed, the court received and filed a letter brief prepared by the Attorney General's office on behalf of DSS. Pointing out that DSS was not a party to the underlying action, the brief was submitted "(1) to provide the court with further information about the Department's and Sacramento County Department of Health and Human Services' ('DHHS') prior interaction concerning the interpretation and implementation of section 361.4; (2) to explain the tremendous impact and burden of its decision on the Department; and (3) to respectfully request the [c]ourt to either withdraw its decision from publication, or reconsider its decision on its own motion and accept further briefing from the Department to aid in the [c]ourt's decision on rehearing."

We have read and considered the letter brief and have concluded that nothing set forth therein, including specifically the department's reading of section 361.4, subdivision (d)(3), calls into question our interpretation of the statute. The department's request that we reconsider our decision on our own motion is denied.

*See footnote, *ante,* page 1337.