Filed 6/8/15

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| A. M., | E062316 |
| Petitioner, | (Super.Ct.No. J213187) |
| v. | OPINION |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY et al., | |
| Respondents; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

---

\*       Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

PURPORTED APPEAL from the Superior Court of San Bernardino County. Cheryl C. Kersey, Judge. Appeal treated as petition for writ of mandate; petition denied.

Sharon S. Rollo, under appointment by the Court of Appeal, for Petitioner A.M.

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson and Jamila Bayati, Deputy County Counsel, for Real Party in Interest.

No appearance for Respondents.

A.M., now aged eight, was born with severe genetic defects that left him deaf, blind, and lacking cognitive functioning. He has been a dependent of the juvenile court almost since birth; when he was four, parental rights were terminated. All through his young life, he has been cared for by professionals at a health care facility. Now, however, the juvenile court has approved his placement for adoption with a woman in Northern California who has a history of adopting children with special health care needs.

Minor's counsel has appealed on A.M.'s behalf. In the published portion of this opinion, we will hold that under Welfare and Institutions Code section 366.28, which restricts the appealability of a specific placement order after parental rights have been terminated, the challenged order is nonappealable; however, we find good cause to exercise our discretion to deem the failed appeal to be a writ petition. In the unpublished portion of this opinion, we will hold that the adoptive placement was not an abuse of discretion.

2

I

FACTUAL AND PROCEDURAL BACKGROUND

C.M. (father) impregnated his daughter K.M. (mother) when she was 14 years old. As a result, in October 2006, San Bernardino County Children and Family Services (CFS) filed a dependency petition regarding the mother. In January 2007, the mother was adjudicated a dependent.

When A.M. was born, in February 2007, he suffered from softening of the brain, cerebral palsy, spastic quadriplegia, and seizures. Initially, doctors believed this was due to an "intrauterine insult." Eventually, however, they came to believe it was more likely due to "the summation of several different genetic disorders" resulting from "parental consanguinity."[1]

The mother was unable to care for A.M. When he was ready to be discharged, CFS detained him and filed a dependency petition regarding him. He was placed at Bain House, an intermediate care facility for developmentally disabled children with a nursing component (ICF/DD-N) operated by Mountain Shadows Special Kids Homes (Mountain Shadows).

In April 2007, at the jurisdictional hearing, the juvenile court sustained jurisdiction based on failure to protect (Welf. & Inst. Code, § 300, subd. (b)), sexual abuse (*id*., § 300, subd. (d)), failure to support (*id*., § 300, subd., (g)) and abuse of a sibling (*id*., § 300,

_____

[1] Most significantly, he had inherited two copies of a defective gene for creatine metabolism; this caused mental retardation and seizures.

subd. (j)).  At the dispositional hearing, it formally removed A.M. from his parents' custody.  It ordered reunification services for the mother but denied them for the father.

In October 2007, at the six-month review hearing, the juvenile court terminated reunification services and set a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26 (section 366.26).

In February 2008, at the section 366.26 hearing, the juvenile court found that A.M. had a probability of adoption but was difficult to place for adoption.  Accordingly, it identified adoption as the permanent placement goal and continued the hearing without terminating parental rights.  (See Welf. & Inst. Code, § 366.26, subd. (c)(3).)

In August 2008, at the continued section 366.26 hearing, the juvenile court ordered a planned permanent living arrangement (PPLA)[2] of placement with Mountain Shadows, with the specific goal of adoption.

In November 2010, one Ms. S. expressed an interest in adopting A.M.  She was already caring for five "medically fragile" children and adults, four of whom she had adopted (she was the conservator of the fifth).  Accordingly, CFS filed a "changed

---

   [2]    The Adoption and Safe Families Act of 1997 (Pub.L. No. 105-89 (Nov. 19, 1997) 111 Stat. 2115) coined the term "planned permanent living arrangement" for any living arrangement other than reunification, adoption, legal guardianship, or placement with a relative.  (See 42 U.S.C.A. §§ 675(5)(C).)  It was intended to replace the largely overlapping category, "long-term foster care."  (See *In re Stuart S*. (2002) 104 Cal.App.4th 203, 207-209.)  Some California statutes, however, still refer to "long-term foster care."  (E.g., Welf. & Inst. Code, §§ 366.22, subd. (a), 366.25, subd. (a)(3), 366.26, subds. (b)(6), (c)(1)(B)(vi)(II), (c)(4)(A), 366.3, subds. (d)(3), (h), (i).)

circumstances" petition pursuant to Welfare and Institutions Code section 388 (section 388), seeking to change the permanent plan to adoption.

In February 2011, the juvenile court granted the section 388 petition and set a new section 366.26 hearing.

In May 2011, at a pretrial hearing, minor's counsel expressed concern about the proposed adoption. As a result, the social worker inspected Ms. S.'s home, interviewed Ms. S., and filed an addendum report.

In June 2011, at the section 366.26 hearing, minor's counsel indicated that the social worker's latest report "has . . . more than answered all of the concerns that I had." "[S]he did an excellent job, and now I feel much, much more content." The juvenile court found that A.M. was adoptable, terminated parental rights, and selected adoption as the permanent plan.

In December 2011, the social worker reported that transitioning A.M. to Ms. S.'s home would take three or four days; however, Ms. S. could set aside only two days for this purpose. She warned, "The fact that Ms. S[.] is only willing to set aside two . . . days may jeopardize this placement."

Later in December 2011, at a post-permanency status review hearing, the juvenile court found that adoption was still the appropriate permanent plan.

In June 2012, the social worker reported: "Minor's counsel opposed the adoptive placement at the last court hearing, so adoptive planning was not continued with the prospective adoptive parent."[3]

Later in June 2012, at the next post-permanency review hearing, the juvenile court found that a PPLA at Mountain Shadows, with a specific goal of adoption, was the appropriate permanent plan.[4]

The next social worker's report, in December 2012, stated, "The child was considered for a potential adoptive placement; however, another adoptive family will have to be sought after and recruited." It did not explain further.

In March 2014, the social worker was speaking to members of Ms. S.'s family about another child. She happened to mention that A.M. was still available for adoption. "[T]he family immediately gasped and became tearful. They believed that he had already been adopted and were shocked to learn that was not the case. They requested to be able to go and see [A.M.], but this was not permitted at that time."

---

[3]    This seems to be a mistake; as mentioned, at the most recent hearing, minor's counsel had endorsed the placement.

Although we are speculating somewhat, the record hints that the real problem may have been that another child from San Bernardino County had already been placed for adoption with Ms. S., and it was CFS policy not to place two unrelated children with the same prospective adoptive parent at the same time.

[4]    The juvenile court apparently relied on the social worker's report stating — incorrectly — that this was the "current" permanent plan.

In June 2014, the social worker filed a report recommending "that a [section] 366.26 hearing be set to establish a permanent plan of adoption . . . ."

In November 2014, at a post-permanency review hearing, the juvenile court found that a PPLA was no longer the appropriate permanent plan and changed the permanent plan to adoption. It also ruled: "[T]here is no abuse of discretion committed by [CFS] in locating this permanent home for the minor to permit adoption . . . ." Thus, it gave CFS the authority to place A.M. for adoption. It was agreed that CFS would file an "information packet" before making the actual change of placement, to give minor's counsel an opportunity to appeal and to seek a stay. It was also agreed that a new section 366.26 hearing was not necessary.

Two days later, minor's counsel filed a notice of appeal. In February 2015, acting on a supersedeas petition filed by minor's appellate counsel, we stayed the order authorizing a change of placement.

II

APPEALABILITY

On our own motion, we questioned whether the challenged order is, in fact, appealable. At our request, the parties filed supplemental briefs addressing this issue.

"In dependency proceedings, the order entered at the dispositional hearing is a final judgment and thus is an appealable order. [Citations.]" (*In re Adam D*. (2010) 183 Cal.App.4th 1250, 1261.) As a general rule, "any subsequent order may be appealed as

7

an order after judgment." (Welf. & Inst. Code, § 395, subd. (a).) However, there are exceptions.

One such exception is found in Welfare and Institutions Code section 366.28 (section 366.28), which, as relevant here, provides:

"After parental rights have been terminated pursuant to Section 366.26, an order by the court that a dependent child is to reside in, be retained in, or be removed from a specific placement, is not appealable at any time unless all of the following apply:

"(A)  A petition for extraordinary writ review was filed in a timely manner.

"(B)  The petition substantively addressed the specific issues to be challenged and supported that challenge by an adequate record.

"(C)  The petition was summarily denied or otherwise not decided on the merits.

"(2)  Failure to file a petition for extraordinary writ review within the period specified by rule of court, to substantively address the specific placement order that is challenged, or to support that challenge by an adequate record shall preclude subsequent review by appeal of the findings and orders made pursuant to this section."

According to the legislative history of Welfare and Institutions Code section 366.28, "[t]he introduction of the bill was prompted in part by the case of *In [r]e Harry N.* (2001) [93 Cal.App.4th 1378].  In that case, both the foster family and the blood relatives of the child sought to adopt him.  After the local child services agency ordered placement with the relatives, the foster family appealed, an appeal which took eighteen

8

months to resolve — at the end of which time the child was removed from the foster family and placed with the relatives. The length of the appeals process in that case served no one's interest, least of all that of the child, who was denied the security of permanent placement for over a year." (Assembly Com. on Judiciary, com. on Sen. Bill No. 59 (2003–2004 Reg. Sess.) as amended June 11, 2003, p. 1, italics added.[5])

Here, the juvenile court's ruling giving CFS the authority to place A.M. with Ms. S. is nonappealable under section 366.28. However, that is not all the juvenile court did: It also changed A.M.'s permanent plan from a PPLA to adoption. Minor's appellate counsel contends that this aspect of the order is appealable.

In considering the scope of section 366.28, we look to an analogous provision, Welfare and Institutions Code section 366.26, subdivision (*l*) (section 366(*l*)). It provides that an order setting a section 366.26 hearing "is not appealable at any time" unless a timely and adequate writ petition has been filed and summarily denied or otherwise not decided on the merits. Section 366.28 is closely modeled on section 366(*l*).

In applying section 366(*l*), it has been held that, in addition to the order setting a section 366.26 hearing itself, any contemporaneous order that is "designed to overturn" the order setting a section 366.26 hearing is likewise nonappealable, even if it would otherwise be appealable. (*In re Rashad B*. (1999) 76 Cal.App.4th 442, 447-448, and cases cited; accord, *In re Cicely L.* (1994) 28 Cal.App.4th 1697, 1705-1706 [Fourth Dist.,

---

[5]     Available at <http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_0051-0100/sb_59_cfa_20030616_181756_asm_comm.html>, as of May 19, 2015.

9

Div. Two].)  We believe a similar test of appealability should apply under section 366.28.

That is the only way to carry out the legislative intent of preventing lengthy appeals from

delaying a child's permanent placement.**6**

Here, in June 2012, the juvenile court had approved a PPLA at Mountain Shadows

as A.M.'s permanent plan.  Thus, before A.M. could be placed for adoption, the juvenile

court had to change the permanent plan.**7**  If we were to agree that the juvenile court erred

by changing the permanent plan to adoption, that would necessarily mean that it also

erred by placing him for adoption with Ms. S.  In sum, any challenge to the order

changing A.M.'s permanent plan is designed to overturn the order placing him with

Ms. S.  Accordingly, both aspects of the juvenile court's order are equally nonappealable.

Minor's counsel also contends that compliance with the writ requirement should

be excused because the juvenile court did not expressly advise the parties of the

requirement.

---

**6**     Section 366.28, subdivision (c) provides:  "This section does not affect the right of a parent, a legal guardian, or the child to appeal any order that is otherwise appealable and that is issued at a hearing held pursuant to Section 366.26."  The order challenged here was issued at a review hearing pursuant to Welfare and Institutions Code section 366.3, not a section 366.26 hearing.  Accordingly, we have no occasion to consider whether a similar order issued at a section 366.26 hearing would be appealable under this provision.

**7**     It is at least arguable that the juvenile court could not change the permanent plan at a review hearing, and that it should have set a section 366.26 hearing first instead. (See Welf. & Inst. Code, § 366.3, subd. (h).)  Nevertheless, that is what it did.  None of the parties objected; in fact, they agreed that a section 366.26 hearing was not necessary.

Once again, this argument depends on an analogy to section 366(*l*). That subdivision directs the Judicial Council to adopt a court rule that the juvenile court, when it sets a hearing under section 366.26, must "advise all parties of the requirement of filing a petition for extraordinary writ review as set forth in this subdivision in order to preserve any right to appeal in these issues." (Welf. & Inst. Code, § 366.26, subd. (l)(3)(A).) And the Judicial Council has done so. (Cal. Rules of Court, rule 5.590(b); see also Cal. Rules of Court, former rule 1435(b).)

"Courts have held that where the juvenile court fails entirely to advise a parent of his or her right to seek writ review of an order terminating reunification services and setting a section 366.26 hearing, claims of error relating to provision of reunification services are cognizable on appeal from the order terminating parental rights. [Citations.]" (*In re X.Z.* (2013) 221 Cal.App.4th 1243, 1250-1251.) This is because the absence of a writ advisement ordinarily constitutes good cause for the parent's failure to file a writ petition. (*In re Cathina W.* (1998) 68 Cal.App.4th 716, 722.)

This is so even when a parent has appointed counsel. "The 'burden is on the *parent* in a juvenile dependency case to pursue his or her appellate rights[; i]t is not the *attorney's* burden.' [Citations.] In the absence of a specific direction from the [parent], [his or] her attorney in the juvenile court [i]s not obligated to take any steps to comply with section 366.26, subdivision (*l*), on [the parent]'s behalf. [When] the [parent] ha[s] not been notified that [he or] she must seek relief by writ petition under this statute, [the

11

parent] could not very well have directed [his or] her attorney to take steps to do so." (*In re Cathina W.*, *supra*, 68 Cal.App.4th at pp. 723-724, fn. omitted.)

In this respect, however, the analogy to section 366(*l*) breaks down. First, the rules of court implementing section 366.28 do not require the trial court to advise the parties of the writ requirement. (See Cal. Rules of Court, rules 5.590, 8.454, 8.456.) Second, while the lack of an advisement may be good cause for a *parent's* failure to file a writ petition, it is not good cause for a *child's* failure. The child's appointed counsel normally acts as guardian ad litem for the child. (Welf. & Inst. Code, § 326.5; Cal. Rules of Court, rule 5.662(e)-(f); *In re Josiah Z.* (2005) 36 Cal.4th 664, 680.) Here, the trial court expressly appointed minor's trial counsel as guardian ad litem. Thus, it is fair to presume that the child, through his or her counsel, can file a writ petition even without an advisement. Requiring an advisement under these circumstances would be a pointless formality. (Most likely this is why the Judicial Council did not require one.)

Finally, minor's counsel asks us to treat the failed appeal as a writ petition.

We have discretion to treat a purported appeal as a petition for writ of mandate. (*Olson v. Cory* (1983) 35 Cal.3d 390, 401.) Admittedly, "'[a] petition to treat a nonappealable order as a writ should only be granted under extraordinary circumstances, "'compelling enough to indicate the propriety of a petition for writ . . . in the first instance . . . .' [Citation.]"' [Citation.]" (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1367)

12

Such circumstances, however, are present here. The notice of appeal was filed within the seven-day time limit for filing a notice of intent to file a writ petition. (Cal. Rules of Court, rule 8.454(e)(4).) The record is adequate for purposes of writ review. The appeal has been fully briefed. (See *Fox Johns Lazar Pekin & Wexler, APC v. Superior Court* (2013) 219 Cal.App.4th 1210, 1217.) Significantly, CFS responded to the appeal on the merits; it did not argue that we should dismiss the appeal until we spotlighted the issue and requested further briefing. Meanwhile, minor's trial counsel has advocated doggedly for what he perceives to be A.M.'s best interests; it would be inequitable to let it appear that his decision to file a notice of appeal rather than a writ petition was the only reason why his position did not prevail. Finally, if we dismiss the appeal, the underlying issues will effectively evade review (see *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1098); they cannot be presented in some future appeal, and it is too late to file a new writ petition. By publishing this opinion, however, we warn the bar and the public that we will not grant relief from the writ requirement so readily in the future.

Accordingly, we conclude that the challenged order is not appealable, but we elect to treat the appeal as a writ petition.

13

THE CHANGE OF PLACEMENT

Minor's counsel contends that the juvenile court erred by authorizing CFS to change A.M.'s placement.

A.        *Additional Factual and Procedural Background.*

The evidence before the juvenile court at the critical hearing consisted of four specified social worker's reports, a declaration by a social worker retained by minor's counsel, and oral testimony.

We confine our review to this evidence.

1.        *A.M.'s physical condition.*

By the date of the hearing, A.M. had already outlived his life expectancy.  His diagnoses included "profound mental retardation," microcephaly, cerebral palsy, seizure disorder, spastic quadriplegia, and respiratory insufficiency.  He had been hospitalized seven times, usually for breathing difficulties.

He was in a "semi-vegetative state."  He "d[id] not have any purposeful movement."  He could not walk or talk.  He could not eat; he required a gastrostomy tube (G-tube).  He had to be fed via the G-tube five times a day.  He had no bladder or bowel control.  He had to be catheterized approximately every four hours.

His vision and hearing were impaired.  He "d[id] not respond to visual stimuli and rarely respond[ed] to auditory stimuli."  He had no facial expressions.  He did not respond at all to "social interaction."  Nevertheless, in the opinion of staff at Mountain Shadows,

"he appears to be calmed" by being held, rocked, and massaged. Most of the time, he slept.

A.M. was "completely dependent on caretakers for all of his needs." He needed "breathing treatments" every six hours. He needed a constant supply of oxygen, and his oxygen levels had to be checked once per shift. He had difficulty maintaining his body temperature, which had to be checked three times per shift. His daily medications included phenobarbital, Keppra, Trileptal, Valium, baclofen, Singulair, albuterol, Pulmicort, Bromocriptine, Robinul, Phos-Nak, Tums, Lactinex, Senokot, MiraLax, and Nutropin. He needed approximately 20 additional medications from time to time. He had to be repositioned every two hours to prevent bedsores.

In addition to his primary care physician, Dr. Ravindra Rao, A.M. was under the care of some eight to ten specialists. Dr. Rao stated that "[h]is needs can be met in an ICF/DD-N facility[;] however[,] due to his multiple diagnoses he would not tolerate a lower level of care."[8] After talking to the social worker, however, who gave him "a detailed and in-depth description of the home and Ms. S.'s qualifications," Dr. Rao was "okay" with placement with Ms. S.

---

[8] According to the social worker, this was "Medi-[C]al specific language," "required for Medi-[C]al purposes and billing"; thus, it was did not mean that A.M. could not be properly cared for outside an ICF/DD-N facility.

15

2. *Mountain Shadows.*

Mountain Shadows did "an excellent job in providing for [A.M.'s] care." It did not have a doctor, a registered nurse (RN) or a licensed vocational nurse (LVN) on-site. However, it did have an RN and an LVN who circulated from site to site.

3. *Ms. S.*

As of the date of the hearing, Ms. S. was 70 years old. She lived in Weimar, California (in the general vicinity of Placer, Sacramento, and San Joaquin Counties). She had spent 40 years taking care of children with special health care needs; her mother had also taken care of children with special health care needs.

Ms. S. had been certified to provide foster care to children with special health care needs, and she had done so for over 25 years. In 2001, however, she had decided that she wanted to provide a permanent adoptive home for the children in her care.

She had also been licensed as a psychiatric technician. Her licensure had lapsed in 2006 or 2007; however, she was not required to have any particular certification to work with adopted children.

Ms. S. was assisted by her daughter and son-in-law, who could fill in for her in her absence. They would also take over if she died or became incapacitated. In addition, she had three hired staff members. They had been trained by the county to provide in-home supportive services, first aid, and CPR; Ms. S. had given them additional training. None of the staff members was an RN or an LVN, but at least one was a Certified Nurse Assistant (CNA).

16

Ms. S. was already caring for three adults and three children; she had adopted all but one of them (who was in a conservatorship). They had many of the same or similar diagnoses as A.M., including severe developmental delays, microcephaly, cerebral palsy, seizure disorder, spastic quadriparesis, and blindness. Several of them required G-tubes.

Previously, three adopted children had died while in Ms. S.'s care, but their deaths were not considered suspicious. Those children had been with her for fifteen years, nine years, and six years, respectively, and each of them had exceeded their life expectancy.

After Ms. S. was briefed on A.M.'s needs, she said "there wasn't anything that [A.M.] has that she has not had experience dealing with . . . ." The specialists he needed were available at UC Davis. In the event of an emergency, a fire department was a mile and a half away and a hospital was 10 miles away.

In August 2014, the social worker inspected Ms. S.'s home. The other children in her home appeared "to be well[-]cared for and without any evidence of abuse or neglect." She found that the children showed "fondness and affection" for Ms. S., and Ms. S. did for them.

The social worker concluded "that Ms. S[.]'s home is an excellent place for [A.M.] to be loved and cared for. The care that he would receive is at least equal to the care he currently receives at Mountain Shadows but with the added element of a family environment."

In the social worker's opinion, Ms. S. could "duplicate[]" the level of care that A.M. was receiving from Mountain Shadows.

17

B.      *Analysis*.

Once the juvenile court selects adoption as the permanent plan and terminates parental rights, CFS has exclusive control over placement, subject only to review for abuse of discretion.  (Welf. & Inst. Code, § 366.26, subd. (j); *Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 649-650; *In re Jacob E.* (2004) 121 Cal.App.4th 909, 921-922; *In re Harry N.* (2001) 93 Cal.App.4th 1378, 1397; *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1998) 62 Cal.App.4th 1, 9-10; *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 731-734.)  "'In other words, the court must assess whether [the agency] acted arbitrarily and capriciously, considering the minor's best interests.'  [Citation.]" (*Fresno County Dept. of Children & Family Services v. Superior Court*, *supra*, 122 Cal.App.4th at p. 650.)  "Absent a showing that [the agency]'s placement decision is patently absurd or unquestionably not in the minor's best interests, the court may not interfere and disapprove of the placement."  (*Department of Social Services v. Superior Court*, *supra*, 58 Cal.App.4th at pp. 724-725.)

As in other instances in which the trial court reviews an agency's actions for abuse of discretion, "our review of the . . . record for error is the same as the trial court's; we review the agency's action, not the trial court's decision.'  [Citation.]" (*Creed-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 501 [administrative mandate].)  To put it another way, while the trial court's decision is not entitled to any deference, the agency's decision is entitled to maximal deference.

18

Even if we are considered to be reviewing the decision to change the permanent plan rather than the placement decision, under the peculiar circumstances of this case, the same standard of review would apply. If CFS could properly place A.M. with Ms. S. for adoption, then adoption was an appropriate permanent plan; but if not, then A.M. has no realistic possibility of being adopted, and the juvenile court abused its discretion.

We begin with the principle that "[a]doption is the Legislature's preferred permanent plan. [Citation.] '"Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered." [Citation.] . . . .' [Citation.]" (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) Thus, unless A.M. would clearly be worse off if he were adopted by Ms. S., CFS could reasonably choose to pursue adoption.

According to the social worker, Ms. S. could "duplicate[]" Mountain Shadows's level of care. After she briefed Dr. Rao on the conditions in Ms. S.'s home, he agreed that A.M. could be placed there safely. Their opinions, standing alone, were sufficient to support the placement, unless the opinions were clearly unfounded.

Admittedly, A.M. required a daunting level of care. We have the profoundest respect for the effort and dedication required to feed him via a G-tube five times a day, give him breathing treatments every six hours, catheterize him every four hours, check his body temperature every two or three hours, reposition him every two hours, and administer to him some 20 or 30 medications a day, to say nothing of transporting him

when necessary to doctors' offices and, on occasion, to a hospital. At the same time, however, these are all things that a layperson, with some training and practice, could learn to do.

Minor's counsel presented the opinion of an independent social worker that A.M. required "a minimum of 24 hour per day services of an LVN who is fully awake overnight." However, Dr. Rao contradicted this; in his opinion, "[A.M.] does not require continuous professional nursing services." Even Mountain Shadows did not have an LVN or RN available 24 hours a day.

Ms. S. had 40 years of experience in caring for children with special health care needs. Her sterling record was not tarnished by any hint of abuse or neglect. She had the help of her daughter, her son-in-law, and three hired staff members. If Ms. S. was incapacitated, her daughter and son-in-law would take over for her. They were currently caring for other adults and children with many of the same diagnoses and the same health care needs as A.M. Ms. S. assured the social worker that "there wasn't anything that [A.M.] ha[d] that she ha[d] not had experience dealing with . . . ."

Minor's counsel states that A.M. "had adjusted to [Mountain Shadows,] the only environment he had known in his life," implying that he might be distressed by the move to Ms. S.'s home. However, A.M. had been in and out of hospitals, with no reported display of distress. It is fairly inferable that he has a negligible ability to perceive or to process any differences between the two environments.

20

Minor's counsel also speculates that Ms. S.'s motive for adopting A.M. may be "monetary." There was no evidence of this. To the contrary, Ms. S. displayed "fondness and affection" for the other children she had adopted. When she and her family learned that A.M. was still available for adoption, "the family immediately gasped and became tearful" and asked if they could see him. If only out of an excess of caution, we note that, even assuming Ms. S. wanted to adopt for wholly or partially financial reasons, those financial reasons would also give her a motive to keep A.M. healthy for as long as possible.

The social worker testified, "I believe [A.M.] feels love." Thus, in her opinion, "[t]he current placement with Mountain Shadows is adequate and does meet the child's needs. However, the placement with Ms. S. will be a home of permanency where [A.M.] will be loved, cared for and made a permanent part of the S. family."

Whether A.M. would be affirmatively better off with Ms. S., however, is not crucial to the outcome. What is crucial is that CFS could reasonably conclude that he would be no worse off. On this record, we cannot say "that [the agency]'s placement decision is patently absurd or unquestionably not in the minor's best interests, the court may not interfere and disapprove of the placement." (*Department of Social Services v. Superior Court*, *supra*, 58 Cal.App.4th at pp. 724-725.) Thus, the legislative preference for adoption must prevail.

## IV

## DISPOSITION

The purported appeal is deemed to be a petition for writ of mandate, and as such, is denied.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.